# VOLUME \ OF \

COURT OF CRIMINAL APPEALS NO. _CR 04-0476_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

# CIRCUIT COURT OF _Montgomery_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC 02-732.60_

CIRCUIT JUDGE _Shashy_

Type of Conviction / Order Appealed From: _____ _Supplemental_

Sentence Imposed: _____

Defendant Indigent: ■ YES ☐ NO

_Willie L. Gardner_
NAME OF APPELLANT

_Willie L. Gardner AIS# 231984_
(Appellant's Attorney)                    (Telephone No.)
_100 Warrior Lane_
(Address)
_Bessemer        AL        35023_
(City)              (State)              (Zip Code)

V.

_STATE OF ALABAMA_

(State represented by Attorney General)                 NAME OF APPELLEE
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____        **Supplemental**

(For Court of Criminal Appeals Use Only)

INDEX
## CLERK'S RECORD

CASE ACTION SUMMARY……………………………………………………    1-2

MOTION TO SUPPLEMENT THE RECORD ON APPEAL TO INCLUDE
REPORTER'S TRANSCRIPT……………………………………………………    3-4

REPORTER'S TRANSCRIPT ORDER………………………………………………..    5

ORDER GRNATING DEFENDANT'S MOTION TO SUPPLEMENT……………    6

CERTIFICATE OF COMPLETION………………………………………………    7

```
ACRO370                    ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 2002 000732.60
   ER: TOR                      CASE ACTION SUMMARY
    E:   1                       CIRCUIT  CRIMINAL                    RUN DATE: 09/09/2004
```

IN THE CIRCUIT COURT OF MONTGOMERY

JUDGE: WAS

STATE  OF  ALABAMA                      VS      GARDNER WILLIE LIZZLIE
                                                AIS# 231984  4-13
CASE: CC 2002 000732.60                          100 WARRIOR LANE
                                                BESSEMER, AL  35023 0000

DOB: 05/29/1985          SEX: M  RACE: B  HT: 5 10  WT: 170   HR: BLK EYES: BRO
SSN: 903000732  ALIAS NAMES:

CHARGE01: RULE 32-FELONY          CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                         AGENCY/OFFICER: 0030100

DATE WAR/CAP ISS:
DATE    INDICTED:                     DATE ARRESTED: 09/04/2001
DATE    RELEASED:                     DATE    FILED: 08/26/2004
        BOND AMOUNT:         $.00     DATE  HEARING:
                                          SURETIES:
DATE 1:              DESC:
DATE 2:              DESC:             TIME: 0000
                                      TIME: 0000
TRACKING NOS: CC 2002 000732 00  /                    /

   DEF/ATY:                         TYPE:
                                                              TYPE:
                    00000
                                              00000
PROSECUTOR:

```
    CSE: CC200200073200 CHK/TICKET NO:
COURT REPORTER:                        SID NO:              GRAND JURY:
DEF STATUS: PRISON                     DEMAND:       000000000
                                                                      OPER: TOR
```

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | | OPE |
|---|---|---|---|
| 09/09/2004 | ASSIGNED TO: (WAS) WILLIAM A. SHASHY | (AR01) | TOR |
| 09/09/2004 | CHARGE 01: RULE 32-FELONY/#CNTS: 001 | (AR01) | TOR |
| 09/09/2004 | INITIAL STATUS SET TO: "P" - PRISON | (AR01) | TOR |
| 09/09/2004 | DEFENDANT ARRESTED ON: 09/04/2001 | (AR01) | TOR |
| 09/09/2004 | FILED ON: 08/26/2004 | (AR01) | TOR |
| 09/09/2004 | CASE ACTION SUMMARY PRINTED | (AR08) | TOR |
| 09/09/2004 | CAS ATTACHMENT PRINTED | (AR08) | TOR |
| 9/09/04 | Copy of Rule 32 Sent to DA & Aty. | | |
| 11-15-04 | Order Dismissing Rule 32 | | |
| 10/07/04 | Statis Answer) | | |
| 2/04 | Request for Production | | |
| 11/05/04 | ~~Request~~ Response Els Part to Respondent Answer | | |
| 12/14/04 | Notice Of Appeal of 4 pass | | |

ACRO369    A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2002 000732.60
JUDGE ID:  WAS

STATE  OF  ALABAMA                    VS    GARDNER WILLIE LIZZLIE

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------|
| 12/14/04 | Notice Of Appeal w/ Forms |
| 12/16/04 | Appeal Transmittal To Crm Appls, AG & Def. |
| 01/04/05 | Transcript To Crm Appls, AG & Def. |
| 01/10/05 | Motion To Supplement The Record On Appeal To Exclude Reporter's Transcript |
| ~~01/11/05~~ | ~~Release~~ |
| 01/21/05 | Order Granting Motion To Supplement |

IN THE CIRCUIT COURT OF MONTGOMERYCOUNTY, ALABAMA

WILLIE L. GARDNER,                        *

    Petitioner/Appellant,          *

vs.                                        *        CASE NO. CC02-732.60

STATE OF ALABAMA,                          *        CRIMINAL APPEALS DK. NO._____

    Respondent/Appellees.          *

## MOTION TO SUPPLEMENT THE RECORD
## ON APPEAL TO INCLUDE REPORTER'S TRANSCRIPT

COMES, now the petitioner/appellant in the above style cause before the court pursuant to Rule 10(g) Ala.R.App.Pro. and state as follows:

1.  On or about Jan. 4, 2005 the circuit court certified the completion of the record to the Criminal Court of Appeals.

2.  On or about 12/10/04 the appellant filed Transcript Order Form with the Notice of Appeal requesting that the procedures of the 13A-5-42, Code of Ala. 1975 that transpired in relationship to the guilty plead be made part of the record for purposes of appeal. see attached Ex. R-61 Record on Appeal.

3.  Upon the petitioner/appellant receiving the certified record on appeal he observed that there was no proceedings consistent with the coloquy of the plead bargaining process other other coloquy consistent with the process under 13A-5-42, Code of Ala. 1975; and such have specific relevance to the ineffective assistence of counsel issue/and the knowingly and voluntarily entering of the plead.

THEREFORE, with premises considered your petitioner/appellant herein moves that the record on appeal be supplemented.

Respectfully submitted,

Willie L. Gardner

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing legal document has been served on the appellee/respondents this 10th day Jan 2005, by placing the same in the United States mail postage prepaid and addressed as follows:

DARYL D. BAILEY
CHIEF DEPUTY DISTRICT ATTORNEY
100 South Lawrence Street
Montgomery, Ala. 36104

Respectfully submitted,

*Willie L. Gardner*
WILLIE L. GARDNER
A.I.S.#231984
100 Warrior Lane
Bessemer, Ala. 35023

cc. CLERK, CRIMINAL COURT OF APPEALS
    STATE OF ALABAMA
    300 Dexter Ave.
    P.O. Box 301555
    Montgomery, Ala. 36130-1555

Unified Appellate Form

Form ARAP-1C    8/91

See Rules 10(c) and 11(b) of the
Alabama Rules of Appellate Procedure (A.R. App.)

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[✓] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF ___*MONTGOMERY*___ COUNTY

___*WILLIE L. GARDNER*___ , Appellant

V.  [✓] STATE OF ALABAMA  [ ] MUNICIPALITY OF _____

| Case Number | Date of Judgment/Sentence/Order |
|---|---|
| CC-02-0732.60-WAS | 11/15/04 |

| Date of Notice of Appeal | | Indigent Status Granted: |
|---|---|---|
| Oral: _____ Written: 12/14/04 | | [✓] Yes  [ ] No |

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

X _____    X _____    X _____
Signature              Date                  Print or Type Name

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                       COURT REPORTER(S)

A. [✓] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence     *trans. of proceedings under*
proceedings, a transcript of the organization of the jury and arguments of counsel must     *13A-5-42 AL Code 1975*
be designated separately.                                                                    *guilty pleads capital murder*

B. [ ] ORGANIZATION OF THE JURY - This designation will include voir dire examination and
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. [ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. *ALL PLEADING OF RULE 32* | *8/22/04* | |
| E. | | |
| F. | | |
| G. | | |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

X *Willie Gardner*    X *12/10/04*    *Willie L. Gardner*
Signature              Date            Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

*6*

IN THE CIRCUIT COURT FOR
MONTGOMERY COUNTY, ALABAMA

WILLIE LIZZLIE GARDNER          )

v.                              )          CASE NO. CR-04-0476
                                           (Montgomery Circuit Court No.CC02-732.60)
STATE OF ALABAMA                )

## O R D E R

It is hereby ORDERED that Defendant's Motion to Supplement the Record on

Appeal filed on January 12, 2005, is granted. It is directed that the supplemental record

be prepared and filed at the earliest possible date and by no later than February 8, 2005.

Done this the 21st day of January, 2005.

_____
WILLIAM A. SHASHY
Circuit Judge

Hon. H. W. "Bucky" McMillan
Willie Lizzlie Gardner, Pro Se
Office of the Attorney General
Mary King, Court Reporter

RECEIVED
1-21-05
CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br><br>ARAP-14          Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
| --- | --- | --- |

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: 12/14/04 |
| --- | --- |

**APPELLANT**

Willie L. Gardner

**v. STATE OF ALABAMA**

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___9th___ day of __February, 2005__.

_____Melissa Rittenour_____
Circuit Clerk

IN THE CIRCUIT COURT

OF

MONTGOMERY COUNTY, ALABAMA


STATE OF ALABAMA,

               Plaintiff,

      VS.                        CC-02-732

WILLIE L. GARDNER,

               Defendant.

_____/

TRIAL

OCTOBER 27-28, 2003


BEFORE:  THE HONORABLE WILLIAM A. SHASHY

CIRCUIT JUDGE

\* \* \* \* \* \*

APPEARANCES


FOR THE STATE:

      Ms. Ellen Brooks
      Ms. Vernetta Perkins
      Mr. Michael Kidd


FOR THE DEFENDANT:

      Ms. Debra Hollis
      Mr. David Belser


MARY R. KING, RMR

OFFICIAL COURT REPORTER

1              (Defendant present.)

2              THE COURT:  Ladies and gentlemen,

3    we're about to start the selection of a jury in

4    the case of State of Alabama versus Willie

5    L. Gardner.  This is a case in which

6    Mr. Gardner is charged with capital murder.  I

7    mention that to you because I'm going to ask

8    you shortly if you know or if you've heard

9    anything about the facts or circumstances

10    surrounding this case.  But before I do that,

11    I'm going to introduce you to who is sitting

12    here today.

13         The State of Alabama today is represented

14    by Ms. Ellen Brooks.  Ms. Brooks, would you

15    introduce yourself and who is sitting with you

16    today?

17              MS. BROOKS:  Yes, Your Honor.  Good

18    morning.  My name is Ellen Brooks, and I'm your

19    district attorney.  Working with us on this

20    case is Mr. Michael Kidd, who is a deputy

21    district attorney; and also, Ms. Vernetta

22    Perkins, deputy district attorney.

23         Would you like me to introduce them?

24              THE COURT:  Yes, ma'am.

25              MS. BROOKS:  The mother of the

deceased in the case is Robin Benefield.

Robin, would you stand?  And also involved in

the case is a person -- is a victim, the other

victim, Ray Davis.

THE COURT:  Thank you, ma'am.  Now I'm

going to introduce the attorneys representing

the defendant today.

Mr. David Belser, would you introduce

yourself and who sitting with you today?

MR. BELSER:  My name is David Belser.

My co-counsel is Deborah Hollis.  And sitting

with me today is Willie Gardner.

THE COURT:  All right.  Thank you,

sir.  Now that I've introduced everyone here,

I'm going to have Ms. Cummings call the name of

the potential jurors.  When she calls your

name, please stand, give your occupation.  If

you're married, give us the occupation of your

spouse, okay?

LAW CLERK:  Rita Allen.

PROSPECTIVE JUROR:  I work with the

State of Alabama Department of Revenue.  I'm a

manager there.  My husband also works for the

State of Alabama Department of Revenue, and

he's a network specialist.

4

```
1                    LAW CLERK:  Dana Alton.

2                    PROSPECTIVE JUROR:  I'm technology

3       coordinator at Forest Avenue Elementary

4       School.  I'm not married.

5                    LAW CLERK:  Ellen Armstead.

6                    PROSPECTIVE JUROR:  I'm traffic

7       coordinator and my husband is an assembler.

8                    LAW CLERK:  Sharon Atkinson.

9                    PROSPECTIVE JUROR:  I'm client account

10      manager with Xerox Corporation.  My husband is

11      the Dean of the College of Veterinary Medicine

12      at Tuskegee University.

13                   LAW CLERK:  Garrett Baldwin.

14                   PROSPECTIVE JUROR:  My name is Garrett

15      Baldwin.  I'm not working anywhere right now.

16                   LAW CLERK:  Stephanie Barlow.

17                   PROSPECTIVE JUROR:  I'm an assistant

18      director at a day care, New Life Care; and my

19      husband works at Thermalex.

20                   LAW CLERK:  Christy Bell.

21                   PROSPECTIVE JUROR:  I'm a registered

22      nurse, and I'm not married.

23                   LAW CLERK:  Martha Blackwell.

24                   PROSPECTIVE JUROR:  I'm a retired AUM

25      faculty member, and my husband is deceased.
```

5

1          LAW CLERK:  Mary Boone.

2          PROSPECTIVE JUROR:  I'm not working

3     right now.  My husband is a welder at

4     Continental Eagle.

5          LAW CLERK:  Amy Boyd.

6          PROSPECTIVE JUROR:  Teacher at Goodwyn

7     Junior High School.  My husband is retired.

8          LAW CLERK:  James Bozeman.

9          PROSPECTIVE JUROR:  My wife and I both

10    are employed with the Montgomery County

11    Commission.

12         LAW CLERK:  Maryann Brown.

13         PROSPECTIVE JUROR:  My name is Maryann

14    Hayes Brown, and I'm a retired faculty member

15    at Troy State University in Dothan.  And I'm a

16    widow.

17         LAW CLERK:  Eva Carson.

18         PROSPECTIVE JUROR:  I'm a teacher with

19    the Montgomery public schools.  My husband is

20    assistant principal at Baldwin Junior High

21    School.

22         LAW CLERK:  Leslie Causey.

23         PROSPECTIVE JUROR:  My name is Leslie

24    Causey.  My wife Jackie and I own and operate

25    Central Alabama Greenhouses.

```
 1              LAW CLERK:  L. H. Courson.

 2              PROSPECTIVE JUROR:  Lance Henry

 3     Courson, manufacturing engineering manager at

 4     Von Gal Palletizers.  My wife is an insurance

 5     agent at the Pinckard Agency off Vaughn Road.

 6              LAW CLERK:  Mose Credic.

 7              PROSPECTIVE JUROR:  My name is Mose

 8     Credic.  I'm assistant principal at Calhoun

 9     High School in Letohatchee, Alabama.  My wife

10     is a Mary Kay consultant.

11              LAW CLERK:  Blanche Culpepper.

12              PROSPECTIVE JUROR:  Blanche Culpepper.

13     I'm retired from Regions Bank.  My husband is

14     also retired.

15              LAW CLERK:  Douglas Cumuze.

16              PROSPECTIVE JUROR:  Douglas Cumuze.

17     Director of operations Capitol Trailways Motor

18     Lines, divorced.

19              LAW CLERK:  John Davis.

20              PROSPECTIVE JUROR:  John Davis.  I'm a

21     self-employed dispute resolution professional,

22     and my wife is the owner of Tranquil Grove Pet

23     Cemetery.

24              LAW CLERK:  Leonard Davis.

25              PROSPECTIVE JUROR:  My name is Leonard
```

1       Davis.  I work for General Dynamics, and I'm

2       single.  I'm single.

3               LAW CLERK:  Michael Diggs.

4               PROSPECTIVE JUROR:  Mike Diggs.  I'm a

5       cost analyst for Automated Research, and my

6       wife is a preschool teacher.

7               LAW CLERK:  Rebecca Dobbs.

8               PROSPECTIVE JUROR:  I'm a registered

9       nurse.  I work at HealthSouth, and I'm

10      divorced.

11              LAW CLERK:  Dana Discroll.

12              PROSPECTIVE JUROR:  I'm an

13      administrator with the Department of Public

14      Health, and I'm not married.

15              LAW CLERK:  Stephen Duncan.

16              PROSPECTIVE JUROR:  Buster with

17      Central Alabama Food Service, and I'm not

18      married.

19              LAW CLERK:  Lottie Eldridge.  Lottie

20      Eldridge.

21              PROSPECTIVE JUROR:  I'm a housemaid.

22              LAW CLERK:  Linda Evans.

23              PROSPECTIVE JUROR:  I'm Linda Evans.

24      I'm regional -- southeast regional director for

25      CMS Information Services, information

1    technology; and my husband is retired.

2        LAW CLERK: Clement Fitzpatrick.

3        PROSPECTIVE JUROR: I'm Tranham

4    Fitzpatrick. I'm CEO of Guilford Capital

5    Corporation. My wife Martha is a homemaker.

6        LAW CLERK: Elaine Flowers.

7        PROSPECTIVE JUROR: I'm a retired

8    nurse. My husband is retired as a civil

9    engineer.

10        LAW CLERK: Kathy Green.

11        PROSPECTIVE JUROR: I'm a widowed

12    woman.

13        LAW CLERK: Lucia Grice.

14        PROSPECTIVE JUROR: I'm self-employed,

15    and my husband works for Senari Systems as a

16    contractor.

17        LAW CLERK: Mary Gunn.

18        PROSPECTIVE JUROR: I'm a teller at

19    Regions Bank, and my husband works for the

20    State of Alabama Insurance Division.

21        LAW CLERK: Deborah Hall.

22        PROSPECTIVE JUROR: I'm Deborah Hall.

23    I'm training coordinator for the State

24    Department of Finance, and my husband is a

25    self-employed photographer.

```
 1              LAW CLERK:  Perry Hardy.
 2              PROSPECTIVE JUROR:  My name is Perry
 3      Hardy.  I'm a supervisor of the driver's
 4      license division of Department of Public
 5      Safety, and my husband is a supervisor of
 6      shipping and receiving, CCC and Associates.
 7              LAW CLERK:  Barbara Harper.
 8              PROSPECTIVE JUROR:  I'm special
 9      projects coordinator at --
10                  (Brief interruption.)
11              THE COURT:  I'm sorry.  Would you
12      repeat that, please?  Can you repeat that?
13              PROSPECTIVE JUROR:  Special projects
14      coordinator at Montgomery AIDS Outreach, and
15      I'm divorced.
16              THE COURT:  Thank you, ma'am.
17              LAW CLERK:  Barbara Harris.
18              PROSPECTIVE JUROR:  I'm employed at
19      ConAgra, and I'm also a Mary Kay consultant.
20      And my husband works for the Montgomery Housing
21      Authority.
22              LAW CLERK:  Rebecca Henderson.
23              PROSPECTIVE JUROR:  I'm a housewife,
24      and my husband has Capitol Fence Company.
25              LAW CLERK:  Larry Holbrook.
```

1    PROSPECTIVE JUROR:  Senior engineering

2    manager for Lockheed Martin, and I'm divorced.

3    LAW CLERK:  Adrian Houston.

4    PROSPECTIVE JUROR:  I'm a certified

5    network administrator for General Dynamics, and

6    my husband installs fire alarm systems.

7    LAW CLERK:  Thomas Hughes.

8    PROSPECTIVE JUROR:  Telecommunications

9    operator for the State of Alabama, and my wife

10   works for Alfa Insurance.

11   LAW CLERK:  Jerry Hugley.

12   PROSPECTIVE JUROR:  ASU, and not

13   married.  Alabama State University, not

14   married.

15   THE COURT:  Anybody's name we did not

16   call?

17   Now I'm going to ask you a few questions.

18   If you need to respond, please stand, again,

19   tell me your name and any details that may be

20   helpful.  If I ask a question which refers to

21   family members, this would include spouse,

22   children, grandchildren, parents, grandparents,

23   brothers and sisters.

24   As I said earlier, the defendant, who is

25   sitting here today, Willie Gardner, are any of

1    you related by blood or marriage or personally

2    acquainted with Mr. Gardner?

3        Are any of you related by blood or

4    marriage or personally acquainted with his

5    attorneys, Mr. Belser and -- yes, sir.

6            PROSPECTIVE JUROR:  I'm acquainted

7    with Mr. Belser.

8            THE COURT:  Judge Davis.  What about

9    Ms. -- I forgot her name.

10            MS. HOLLIS:  Hollis.

11            THE COURT:  I'm sorry.  What about

12    Ms. Hollis.  I have it written down here.  I

13    keep losing it.  I'm just terrible on names.

14        Yes, sir.

15            PROSPECTIVE JUROR:  I'm acquainted

16    with Mr. Belser.  I'm Tranham Fitzpatrick.

17            THE COURT:  All right.  Thank you,

18    sir.

19        Now, let me ask you this.  Would the fact

20    that you know Mr. Belser in any way affect your

21    ability to base your verdict on the evidence

22    presented in this case?

23            PROSPECTIVE JUROR:  No, sir.

24            PROSPECTIVE JUROR:  No, sir.

25            THE COURT:  All right.  Now, the same

1    question over here to these attorneys, the

2    district attorneys, Ms. Ellen Brooks.   Anybody

3    related to Ms. Brooks, Mr. Kidd or Mr. Perkins,

4    know them or related to them?

5             PROSPECTIVE JUROR:   I'm acquainted

6    with Ms. Brooks.

7             THE COURT:   All right.

8             PROSPECTIVE JUROR:   I'm also

9    acquainted with Ms. Brooks.

10             THE COURT:   Your name, ma'am?

11             PROSPECTIVE JUROR:   Dana Driscoll.

12             THE COURT:   Driscoll.   Okay.   And

13    Mr. Fitzpatrick.

14             PROSPECTIVE JUROR:   I'm acquainted

15    with her.

16             PROSPECTIVE JUROR:   I'm also

17    acquainted with Ms. Brooks.

18                 (inaudible.)

19             THE COURT:   I'm sorry.   You need to

20    stand up, ma'am.   It doesn't carry unless you

21    stand up.

22             PROSPECTIVE JUROR:   I understand.   I'm

23    acquainted with Ellen.

24             THE COURT:   All right.   Thank you.

25    And your name again?

1          PROSPECTIVE JUROR: Martha Blackwell.

2          THE COURT: All right. Thank you.

3  Anybody related by blood or marriage or

4  personally acquainted with who is sitting with

5  them today? That would be Mr. Davis and Ms. --

6  tell me your name again.

7          MS. BENEFIELD: Benefield.

8          THE COURT: Benefield. I'm sorry.

9  Anybody know those folks, related to them by

10  blood or marriage?

11          PROSPECTIVE JUROR: My maiden name is

12  Benefield, but I don't know -- I've never seen

13  her before. Probably not related, but --

14          THE COURT: And your name again?

15          PROSPECTIVE JUROR: Rebecca Benefield.

16          THE COURT: Thank you, ma'am. Is

17  anyone here a witness in this case?

18     Now, does anybody have a witness list?

19          MS. BROOKS: Yes, sir.

20          THE COURT: All right. Can y'all read

21  the potential list of witnesses?

22          MS. BROOKS: Did you want me --

23          THE COURT: And if you know any of

24  them or are related to them, let us know.

25  Okay.

1        MS. BROOKS:  Good morning.  Sergeant

2    Keith Barnett, Montgomery Police Department;

3    Scott Belton with the Alabama Department of

4    Forensic Sciences; Detective J. M. Bowman,

5    Montgomery Police Department; Dr. Ben Bristol,

6    Alabama Department of Forensic Sciences; we

7    just did Ray Davis; Lieutenant Mike Gantt,

8    Montgomery Police Department; B. F. Harrison,

9    officer with the Montgomery Police Department;

10   Detective E. E. or Geno Howton, H-O-W-T-O-N,

11   Montgomery Police Department; Ricky Huett, an

12   evidence technician, Montgomery Police

13   Department; Sergeant S. A. Martino, Montgomery

14   Police Department; Detective G. R. Naquin, Guy

15   Naquin, N-A-Q-U-I-N, Montgomery Police

16   Department; Mr. Mickey Phillips, owner of the

17   Premium Package Store on Adams Avenue; Joe

18   Saloom, S-A-L-O-O-M, Alabama Department of

19   Forensic Sciences; and Tawaskie Williams.

20        Thank you, Judge.

21        THE COURT:  Thank you.  Anybody know

22   any of those folks or related to them by blood

23   or marriage?

24        All right.  Has anyone here or anyone in

25   your immediate family been employed by the

1    Montgomery Police Department or any other law

2    enforcement agency?  Yes, sir.

3              PROSPECTIVE JUROR:  My wife was

4    employed by the city police department 20 years

5    ago.

6              THE COURT:  All right.  And that's --

7              PROSPECTIVE JUROR:  As a civilian.

8              THE COURT:  That's Judge Davis.

9         All right.

10             PROSPECTIVE JUROR:  I'm employed by

11   the Department of Public Safety.

12             THE COURT:  And your name again?

13             PROSPECTIVE JUROR:  Perry Hardy.

14             THE COURT:  All right.  Thank you,

15   ma'am.

16        Does anyone here have any interest in the

17   conviction or acquittal of the defendant or has

18   anyone made any promises or given any

19   assurances that he or she will convict or

20   acquit the defendant?

21        Does anyone have a fixed opinion as to the

22   guilt or innocence of the defendant which would

23   bias your verdict?

24        Now, this case -- let me tell you what

25   this case is about.  I don't think I did that.

1    This is an alleged capital murder case that

2    arises out of the robbery of -- what was the

3    name of the store?  Someone help me out here.

4              MS. BROOKS:  Premium Package Store or

5    Big Al's.

6              THE COURT:  And the date of it?

7              MS. BROOKS:  Labor Day, 2001.

8              THE COURT:  Now, there has been some

9    things in the newspaper and the press about

10   that.  Has anybody heard anything about that

11   case?

12             PROSPECTIVE JUROR:  I've seen it on --

13   Blanche Culpepper.  I've seen it on -- you

14   know, in the newspaper.

15             PROSPECTIVE JUROR:  And I have, too.

16   Tranham Fitzpatrick.

17             THE COURT:  All right.  That would be

18   Mrs. Culpepper?

19             PROSPECTIVE JUROR:  Yes, sir.

20             PROSPECTIVE JUROR:  Tranham

21   Fitzpatrick.

22             THE COURT:  Fitzpatrick.

23             PROSPECTIVE JUROR:  Adrian Houston.

24             PROSPECTIVE JUROR:  Tom Hughes.  And

25   I've seen it on the TV --

```
 1              THE COURT:  Tommy Hughes.  I'm sorry.
 2    Who else?  Wait a minute.  Y'all hold on.
 3    Let's start on the front row.  Wait a minute.
 4    Y'all have got to stand up.  We just don't hear
 5    you.  I'm sorry.
 6              PROSPECTIVE JUROR:  Elaine Flowers.  I
 7    saw it on TV and the newspaper.
 8              THE COURT:  All right.  Anybody else
 9    on the front row?
10              PROSPECTIVE JUROR:  Sharon Atkinson.
11    I saw it in the newspaper.
12              PROSPECTIVE JUROR:  Stephen Duncan.
13    I've seen it on the news and the newspaper.
14              PROSPECTIVE JUROR:  Adrian Houston,
15    newspaper.
16              THE COURT:  All right.  The next row.
17    Second row.
18        All right.  Third row.
19              PROSPECTIVE JUROR:  Kathy Green, and
20    I've seen it in the news and -- the newspaper
21    and the TV, both.
22              THE COURT:  All right.
23              PROSPECTIVE JUROR:  Martha Blackwell,
24    newspaper and TV.
25              PROSPECTIVE JUROR:  Linda Evans,
```

1    newspaper.

2          THE COURT:  That was Evans?

3          PROSPECTIVE JUROR:  Yes, sir.

4          PROSPECTIVE JUROR:  You had already

5    gotten my name, I think, Judge.

6          THE COURT:  Yes, ma'am.

7       All right.  Next row.  We got

8    Mr. Fitzpatrick.  All right.

9          PROSPECTIVE JUROR:  Garrett.  I've

10   seen it on the news.

11         THE COURT:  That was Garrett?

12         PROSPECTIVE JUROR:  Yes, Garrett.

13         THE COURT:  I'm sorry.  I didn't get

14   your name right.  Tell me your name again.

15         PROSPECTIVE JUROR:  Garrett Baldwin.

16         THE COURT:  Baldwin.  All right.

17      Next row.  Judge Davis.

18         PROSPECTIVE JUROR:  Newspaper and TV.

19         THE COURT:  All right.

20         PROSPECTIVE JUROR:  Thomas Hughes,

21   paper and TV.

22         THE COURT:  All right.  Anyone else?

23      Has anyone here or anyone in your

24   immediate family been charged with the offense

25   concerning murder within the last 12 months,

1    and you may just raise your hand?

2        Y'all approach one second.

3            (Bench conference outside the

4            hearing of the court reporter and

5            the jury.)

6        THE COURT:  Let me ask all you folks

7    that answered they had read or heard something

8    about this case, can each of you set aside what

9    you've read or heard and decide this case based

10   on the evidence presented in this case?  Can

11   all of y'all do that, or is there any of y'all

12   that cannot do that?

13       All right.  And let me also tell you

14   this.  What you may have heard or seen in the

15   newspapers or read may not be accurate.  Do

16   each of you know that?  Can each of you set

17   aside anything you've heard -- and I need y'all

18   to let me know if you can't -- and base your

19   verdict again on what is presented here in

20   trial?  Can each of you do that?  Is there

21   anybody that cannot do it?

22       All right.  Ms. Brooks, do you have any

23   follow-up questions?

24       MS. BROOKS:  Thank you, Your Honor.

25   Good morning.  The Judge asked if you knew

1    the defendant.  I'd like to know if you know

2    any of his family, which includes Felicia

3    Gardner, Michael Scott, Goldie Minora,

4    Lacrassia Gardner -- and I apologize.  I may

5    have said that wrong, L-A-C-R-A-S-S-I-A -- or

6    Shawonda Hampton.  Does anybody know any of

7    those folks?

8         PROSPECTIVE JUROR:  Goldie Minora

9    lives in my neighborhood in east Montgomery.  I

10   don't know him personally, but I've heard about

11   him.

12        MS. BROOKS:  Would the fact that you

13   have heard about this person in any way affect

14   your ability to be fair?

15        PROSPECTIVE JUROR:  No, it wouldn't.

16   No, it wouldn't.

17        MS. BROOKS:  Thank you.  And your name

18   for the record?

19        PROSPECTIVE JUROR:  Kathy Green.

20        MS. BROOKS:  Thank you, Ms. Green.

21      I think you were asked if you knew

22   Mrs. Benefield.  Does anyone know her son or

23   knew her son, Travis Benefield?

24      Does anyone here live near or frequent

25   that Premium Package Store also known as Big

1    Al's?

2    There will be certain items that you may

3    be required to read or listen to.  Does anybody

4    have a hearing or reading problem that would

5    make it difficult for you to be able to examine

6    that evidence?

7    Because of the nature of this case, it

8    involves the death of a human being, some of

9    the evidence may be graphic; for instance,

10   there might be a photograph that had blood on

11   it.  Would the fact that there could be graphic

12   photographs or other evidence cause anyone here

13   not to be able to examine and consider all of

14   the evidence?

15   Some of us are taught to believe, as we

16   have in this country every right to believe,

17   that it is not right for one person to judge

18   another; for instance, judge not least you be

19   judged.  Are there any of you who, because of

20   religious beliefs, moral training, would feel

21   uncomfortable sitting in a jury that would have

22   to judge the defendant's guilt or not?  In

23   other words, everyone here could take this

24   responsibility and follow through based on the

25   facts and the law?

1    Does anyone here possess any personal bias

2    or prejudice against the Montgomery Police

3    Department, which is the investigating agency?

4    Does anybody have a personal bias or prejudice

5    for the police department?

6        Now, the Judge will give us the law in

7    this case.  It's not what we've seen on

8    television.  It's not what any of us lawyers

9    tell you it is.  It's what the Judge says it

10   is.  Can you follow the Judge's instruction on

11   the law even if it's contrary to what you

12   thought or what you believed?

13       Can you set aside what you've heard on CSI

14   and all of those other TV programs and

15   understand that we're going on the law of

16   Alabama in real life?

17       Now, the law says in the state of Alabama

18   in any criminal case that the State must prove

19   its case beyond a reasonable doubt.  The State

20   does not have to prove its case beyond all

21   doubt.  Does everyone understand that

22   difference?

23       Now, this is a serious case, capital

24   murder.  Would anyone here require us to prove

25   the case beyond all doubt because it was a

1    serious case, more serious than, say, a theft

2    of property? You could follow the law?

3        Under the laws of the state of Alabama,

4    there is no legal distinction between an

5    accomplice to a crime and the principal to the

6    crime. That means if individuals agree to

7    commit a criminal offense, one defendant can be

8    held responsible for the actions of the other.

9    For example, if the facts showed that two

10   people participated in a murder, but only one

11   person actually fired the trigger and killed

12   the person, that both still could be found

13   guilty of murder? Is there anyone that feels

14   that an accomplice should not be held as

15   responsible for the actions of the other?

16       Does anybody here feel that life without

17   parole is too serious a punishment for someone

18   convicted of capital murder?

19       I think, if it's all right with the Court,

20   it would be wise for us to tell you that we are

21   not seeking the death penalty in this case. In

22   other words, it is a life-without-parole case.

23   That's why we ask you these questions.

24       Okay. Would anyone's feelings about life

25   without parole make it more difficult to find

1    the defendant guilty?  Would it hinder you in

2    any way?

3        Is there any reason why any of you feel

4    you could not or should not serve in this

5    case?  We do believe that it will last no more

6    than two days possibly and probably only one

7    day.

8        Thank you, Your Honor.

9            THE COURT:  Thank you.

10    Mr. Belser, any follow-up questions?

11            MR. BELSER:  No, Your Honor.

12            THE COURT:  All right.  Y'all approach

13    one second.

14                    (The following occurred at the

15                    bench outside the hearing of the

16                    jury:)

17            THE COURT:  Do we want to qualify the

18    jury for death?

19            MS. BROOKS:  The State does not

20    request any questions about the death penalty.

21            MR. BELSER:  No objection.

22                (Open court)

23            THE COURT:  Ladies and gentlemen, let

24    me ask that you return to the jury assembly

25    room.  And let me give you some rather specific

1    instructions.  You are not to discuss this case

2    among yourselves or with anyone else, okay?  It

3    probably should take us about 20 to 30 minutes

4    to strike a jury.  I'm going to ask that you

5    stay here -- I mean, you can have a 15,

6    20-minute break, but do not leave the jury

7    assembly room until we get this jury struck.

8    All of you be back in that jury assembly room

9    at 12 o'clock, and hopefully, we'll let you

10   know who is going to be on this jury.

11        All right.

12              (Venire dismissed.)

13        MR. BELSER:  I need to put something

14   on the record.  Judge, Ms. Kathy Green, that's

15   Kathy Carter that I graduated with at college.

16   I don't think she recognized me, but I

17   certainly recognize her.  Do you recall -- do

18   you remember Kathy Carter?

19             THE COURT:  Do I remember her?  Do you

20   remember Kathy Carter, Ms. Brooks?

21             MS. BROOKS:  I know who the juror is.

22   I don't know her personally.  Are you saying

23   that you've changed?  Your hair has changed

24   such color, that you've changed so much

25   physically she didn't recognize you?

1          MR. BELSER:  Apparently so.

2          THE COURT:  What's her name now?

3          MR. BELSER:  Kathy --

4          MS. HOLLIS:  Green, I think, now.

5          MR. BELSER:  Kathy Green.  It's Kathy

6     C. Green.

7          MR. KIDD:  I thought he was going to

8     say he was so much better looking today than he

9     was back then.

10          MR. BELSER:  That's probably the

11     truth.

12          THE COURT:  All right.

13          MR. BELSER:  I just wanted to make

14     that known.  She didn't make it known to the

15     Court.

16          MS. BROOKS:  We appreciate that.  We

17     do not challenge for cause on that one.  Thank

18     you, David.

19          THE COURT:  Now, we count 40 jurors.

20     Is that what y'all have got?

21          MR. KIDD:  I had 42.

22          MS. BROOKS:  Let me recount real

23     quickly.

24          THE COURT:  I may have done it wrong.

25          MS. BROOKS:  I think the Court may be

1    right.  I think the Court is right.

2             MR. BELSER:  I got 40.

3             THE COURT:  That's a sufficient

4    number.

5             MR. KIDD:  Forty.

6             THE COURT:  Y'all get nine strikes

7    each.

8             MR. KIDD:  That's going to leave us

9    with two alternates, correct?

10            THE COURT:  Two alternates, yes.  The

11   last two strikes will be the alternates, right?

12            MS. BROOKS:  May we use the jury room

13   here?

14            THE COURT:  Sure you can.

15                (Short recess.)

16            MS. BROOKS:  Can I confirm, then, that

17   each side has 14 strikes and the last strike

18   for each side is an alternate?

19            LAW CLERK:  I thought he said nine.

20            MR. BELSER:  We've got 40.  We need

21   14.  If we both struck 14, that would be 28.

22            MR. KIDD:  We need 28 people removed

23   to leave us with 12.

24            MS. BROOKS:  And if you divide 28 by

25   two, that is 14.

1    MR. BELSER:  Oh, I'm sorry.  The last

2  two will be the alternates.

3    MR. KIDD:  Yes.  So that would be 14

4  strikes with the last one being an alternate or

5  the last one on each side being an alternate.

6    MR. BELSER:  I didn't do well in math,

7  so I trust you.

8    MS. BROOKS:  Is that not your

9  understanding?

10    LAW CLERK:  I mean, that makes

11  mathematical sense.

12    MR. BELSER:  He did say nine.

13    LAW CLERK:  He did say nine.

14    MR. KIDD:  That would be if we had 30

15  jurors.

16    MR. BELSER:  Yes, it would be 14, last

17  two being the alternates.  That's right.  I

18  mean, the numbers are the numbers.  Fourteen.

19    MS. BROOKS:  The State excuses juror

20  number 6.

21    LAW CLERK:  State strikes juror number

22  6.

23    MR. BELSER:  Number 134.

24    LAW CLERK:  Defense strikes 134.

25    MS. BROOKS:  Number 15.

```
1        MR. BELSER:  What was that?

2        MS. BROOKS:  15.

3        LAW CLERK:  State strikes 15.

4        MR. BELSER:  100.

5        LAW CLERK:  Defense strikes 100.

6        MS. BROOKS:  102.

7        LAW CLERK:  State strikes 102.

8        MR. BELSER:  79.

9        LAW CLERK:  Defense strikes 79.

10       MS. BROOKS:  Number 88.

11       LAW CLERK:  State strikes 88.

12       MR. BELSER:  35.

13       LAW CLERK:  Defense strikes 35.

14       MS. BROOKS:  124.

15       LAW CLERK:  State strikes 124.

16       MR. BELSER:  28.

17       LAW CLERK:  Defense strikes 28.

18       MS. BROOKS:  120.

19       LAW CLERK:  State strikes 120.

20       MR. BELSER:  Eight.

21       LAW CLERK:  Defense strikes eight.

22       MS. BROOKS:  161.

23       LAW CLERK:  State strikes 161.

24       MR. BELSER:  65.

25       LAW CLERK:  Defense strikes 65.
```

1          MS. BROOKS:  167.

2          LAW CLERK:  State strikes 167.

3          MR. BELSER:  112.

4          LAW CLERK:  Defense strikes 112.

5          MS. BROOKS:  156.

6          LAW CLERK:  State strikes 156.

7          MR. BELSER:  What was that number?

8          LAW CLERK:  156.

9          MR. BELSER:  42.

10         LAW CLERK:  Defense strikes 42.

11         MS. BROOKS:  82.

12         LAW CLERK:  State strikes 82.

13         MR. BELSER:  117.

14         LAW CLERK:  Defense strikes 117.

15         MS. BROOKS:  165.

16         LAW CLERK:  State strikes 165.

17         MR. BELSER:  163.

18         LAW CLERK:  Defense strikes 163.

19         MS. BROOKS:  192.

20         MR. BELSER:  193.

21         LAW CLERK:  State strikes 192.  The

22    defense strikes 193.

23         MS. BROOKS:  128.

24         LAW CLERK:  The State strikes 128.

25         MR. BELSER:  178, I think.  Yeah,

1    178.

2              LAW CLERK:  Defense strikes 178.

3              MR. BELSER:  What was the State's last

4    strike?

5              LAW CLERK:  128.

6              MS. BROOKS:  39.

7              LAW CLERK:  State strikes 39.

8              MR. BELSER:  61.

9              LAW CLERK:  Defense strikes 61.

10         I have 4 --

11              MS. BROOKS:  Hang on just a second, if

12    you don't mind.

13                   (Brief pause.)

14              MS. BROOKS:  Thank you.

15              LAW CLERK:  I have 4.  I believe

16    that's 13, 19, 41 --

17              MR. KIDD:  Hold on a second.  4, 13,

18    19, 41?

19              LAW CLERK:  Yes.

20              MR. KIDD:  Okay.

21              LAW CLERK:  47, 89, 109, 137, 157,

22    159, 172 and 186.  The two alternates are 39

23    and 61.

24              MR. BELSER:  172 and what?

25              LAW CLERK:  186.

1       MR. BELSER:  Who struck 165?

2       MS. PERKINS:  State.  Strike 11.

3       MR. BELSER:  That was y'all's?

4       MS. PERKINS:  Yes.

5       MR. BELSER:  I didn't get it down.

6       THE COURT:  Y'all ready, ready to get

7    them?  I'm just going to give them some

8    instructions not to listen to the news and

9    everything.

10               (The following occurred in the

11               presence of the jury:)

12       THE COURT:  All right.  Y'all can be

13   seated.

14       Ladies and gentlemen, I'm going to swear

15   y'all in when you get back.  But let me give

16   you some instructions regarding the press.

17   This may very well be on TV or the radio news

18   or something you may hear.  So during -- while

19   you're in this courtroom and while you're at

20   this trial, I do not want you listening to any

21   TV or radio news or reading any newspaper

22   concerning this case, okay?  So don't even

23   listen to any local news until this case is

24   over, all right?  Now, y'all understand that?

25               MS. BROOKS:  Judge, could we ask they

1    not go by the scene either?

2         THE COURT:  Okay.  Do not go by the

3    scene or inspect anything on your own and don't

4    look at any books or law books trying to figure

5    out what a definition is.  I had somebody do

6    that one time and had to declare a mistrial

7    because they went and read something or looked

8    at something they shouldn't have, okay?  The

9    evidence that you will get will come from this

10   witness right over here, the witnesses that

11   will testify or any exhibits that are

12   introduced, okay?  So do any inspect or do

13   anything on your own.  Do not listen to TV or

14   radio news, local news while this is pending,

15   okay?  And we will see you back at -- I usually

16   give you an hour and a half -- two o'clock.

17   Okay.  Thank y'all.

18                    (The following proceedings

19                    occurred outside the presence of

20                    the jury:)

21         THE COURT:  Thank y'all.  We'll see

22   you back at two o'clock.

23                    (Lunch recess.)

24                    (The following occurred in the

25                    presence of the jury:)

1      THE COURT:  Y'all be seated.  The jury

2  stands up.  I've got to swear you in.  Raise

3  your right hand.

4           (The jury was qualified, struck,

5            placed in the jury box and

6            administered the oath of

7            service.)

8      THE COURT:  All right.  Y'all ready to

9  proceed?

10      MS. BROOKS:  Yes.

11      MR. BELSER:  Yes, sir.

12      THE COURT:  I'm going to give y'all an

13  opening charge real quick.  It won't take

14  long.

15      Ladies and gentlemen, before we start the

16  trial of this case, I need to briefly explain

17  the procedures and the duties of the Court and

18  the jury.

19      First of all, as trial judge, it is my

20  duty to ensure the orderly conduct of the

21  trial, rule on questions of law as they arise

22  from time to time; and at the conclusion of the

23  trial, instruct you on the law as it applies to

24  this case.

25      You, as the jury, are the sole and

1    exclusive judge of the facts.  It is your duty

2    to listen to the evidence and from it determine

3    the true facts and then apply the law of this

4    case as given to you by the Court to the facts

5    as you find them to arrive at a true verdict.

6        The procedure that will be followed is,

7    first, counsel for the State will make an

8    opening statement, and then counsel for the

9    defendant will respond.  Each side will be

10   confined to a statement of what they expect the

11   evidence to show.  These statements are not

12   evidence but are given to familiarize you with

13   the case.  Following opening statements,

14   evidence will be presented by witnesses and

15   perhaps by exhibits.

16       The attorneys may at times make

17   objections, and I will rule on the

18   admissibility of the testimony and other

19   evidence.  You must not concern yourself with

20   the reasons for my rulings, since they are

21   controlled and required by law; and you're not

22   to speculate as to possible answers to

23   questions which are not required to be

24   answered.  Additionally, the overruling of

25   objections is not intended to indicate the

1    weight to be given such evidence.

2        Following the close of the evidence, the

3    attorneys will again address you and make

4    closing arguments.  They will discuss the

5    evidence and all reasonable inferences to be

6    drawn to help guide you to a true and just

7    verdict.

8        In order to assist you in your duties, it

9    should be pointed out to you what is and what

10   is not evidence.  First, the arguments and

11   statements of counsel are not evidence.

12   Rulings of the Court are not evidence.  The

13   indictment is not evidence.  Evidence is

14   testimony of witnesses under oath from the

15   witness stand and any physical evidence or

16   exhibits which are admitted and any

17   presumptions of law given to you by the Court

18   in the closing charge.

19       We will be taking breaks about every 45

20   minutes, and we'll probably take a lunch break

21   around noon if we go into tomorrow.  That's

22   just so you can plan your schedule.  That's

23   what I try to do.  It doesn't always happen.

24       Let me also remind you of your conduct

25   outside the courtroom.  I told you once already

1    about the press.  Those instructions I gave you

2    about the press, reading the newspaper, radio

3    or TV are what you are to do until this case is

4    over, okay?  You're not to read or listen to or

5    view any press on this case.  If you should

6    hear something or should somebody tell you

7    something, I need to know what was said, okay,

8    and what you heard.

9        All right.  If you see some of these folks

10   out in the hall, family members, witnesses and

11   so on, and they are rude to you or you think

12   they're rude to you, they can have no contact

13   with a juror, but they're not being rude.  They

14   can't talk to you or -- they will probably shut

15   the elevator door on your face.  They're not

16   being rude, okay?

17       What else do I need to tell you?  Is that

18   about it?  Anything else?  All right.  Thank

19   y'all.

20       All right, Ms. Brooks.  Mr. Kidd.

21           MR. KIDD:  Judge, if it pleases the

22   Court, defense counsel, good afternoon, ladies

23   and gentlemen.  Ladies and gentlemen, my name

24   is Michael Kidd.  I'm a full-time prosecutor

25   here in Montgomery County.  Ms. Brooks sitting

1    here is my boss.  And we're here today to talk

2    about a crime that was committed on Labor Day

3    of 2001, September the 3rd.

4        During that time, there was a business

5    located here in Montgomery County.  It was

6    located over off Adams Avenue.  The name of

7    that business was Premium Package Store.

8    You'll see this later on identified as State's

9    Exhibit Number 3.  This is Premium Package.

10       As you can tell, it's a small business.

11   It's a family-owned business.  This business

12   has been in existence in this same location for

13   35 years.  This business is located at the

14   heart and soul of Tulane Court.  It's a local

15   housing project here just a few blocks from the

16   courthouse.

17       Ladies and gentlemen, the evidence in this

18   case is going to show that it was a Labor Day

19   holiday, that most people in the community were

20   having parties and cook-outs.  They were eating

21   barbecue.  The testimony will be that Ray

22   Davis, who is seated here at counsel table in

23   the blue denim shirt, and his friend, Travis

24   Benefield -- Mr. Benefield is not in the

25   courtroom with us.  Mr. Benefield is deceased,

1    but representing Mr. Benefield is his mother,

2    Robin -- the two of them were not at home

3    enjoying Labor Day with their families.  They

4    weren't at home cooking barbecue or watching

5    football on television.  They were at Premium

6    Package.

7        Premium Package did not close on Labor

8    Day.  It stayed open serving the people in that

9    area, sold adult beverages.  They sold just

10   about everything.  It's kind of a lifeline to

11   Tulane Court and that area.  A lot of folks

12   would come, and they would walk in and out of

13   the store.  And as you can imagine, being a

14   holiday and state beverage stores being closed,

15   it was a very busy day for Premium Package.

16       Ladies and gentlemen, it had gotten well

17   into the evening, 7:30, eight o'clock.  Ray

18   Davis was there with his friend,

19   Mr. Benefield.  And all while they had been

20   there during the day, there were things going

21   on there in Tulane Court.

22       I believe there's going to be testimony

23   that there was a cook-out or a party going on

24   at an individual's house, a female named

25   Bridgette Williams.  I believe also there will

1    be some testimony that her son was an
2    individual named Tawaskie Williams.  He may be
3    referred to as his street name, Solo.  But
4    Tawaskie Williams, the defendant in this case,
5    Mr. Willie Gardner -- Mr. Gardner is seated
6    right here in his Polo Sport T-shirt, sweat
7    shirt -- another individual by the name of
8    Delano Smith.  I believe his street name was --
9    his nickname was Pop.  Let me put this up just
10   for reference.  Willie Gardner, the defendant;
11   Delano Smith, another individual goes by the
12   name of Pop, his street name; a third
13   individual by the name of Anthony Fuller; and
14   then finally, Taurus Hall, a fourth
15   individual.  These guys, along with Tawaskie
16   Williams, were there at this cook-out.  They
17   were shooting dice.  They were playing a game
18   of dice.
19        And I expect the evidence is going to show
20   that during the course of that dice game,
21   Delano Smith or Pop started making comments
22   about how he wanted to go and rob either Big
23   Al's or Premium Package.  I believe the
24   testimony is going to be that Premium Package
25   had previously been known as Big Al's.  The

1    name had changed a few years before.  But as in
2    some cases, a lot of the people that had been
3    in that community for a long time continued to
4    refer to that business as Big Al's, although
5    the official name was Premium Package.

6        But Delano Smith started talking about
7    robbing Big Al's.  He started soliciting
8    individuals to help him.  He turned to Willie
9    Gardner and said, Willie, do you want to go hit
10   a lick?  Let's go up in Big Al's.  And Willie
11   Gardner, the defendant here, was in agreement
12   to do that.  They also looked for additional
13   help.

14       They turned to Anthony Fuller, who was at
15   the dice game.  They got Anthony Fuller on
16   board.  They turned to Tawaskie Williams, the
17   individual known as Solo, and they asked
18   Tawaskie to participate.  I believe the
19   testimony is going to be that Tawaskie decided
20   that he did not want any part of this and told
21   them that, no, I'm not dealing with that.  I'm
22   not going to go in and rob anybody.

23       So, finally, they turn to the fourth
24   individual, Taurus Hall.  I believe the
25   testimony will be that he is known as Big Bug

1    and that these four guys begin to conspire to

2    plan out and to determine how they would in

3    fact rob Premium Package or Big Al's.

4         Now, ladies and gentlemen, the key thing

5    in this is going to be during the course of

6    this planning while these four individuals were

7    agreeing to do the same thing, the one thing

8    that was evident, the one thing that was talked

9    about, the one thing that was known to all four

10   that were involved is that when they hit that

11   door of Premium Package, they were going to be

12   armed and they were going in there to shoot,

13   and not just to shoot.  They were going in

14   there for the purpose of robbing Premium

15   Package and to execute and to kill Travis

16   Benefield and Ray Davis.

17        Now, ladies and gentlemen, the testimony

18   is going to show that these four guys went into

19   Premium Package.  Prior to going to Premium

20   Package, they changed clothes to conceal their

21   identity.  They put du-rags or handkerchiefs

22   over their face so they couldn't be seen.  They

23   loaded themselves up with two handguns, high

24   capacity pistols that would shoot several

25   times, large caliber pistols, a nine millimeter

```
1     they also knew that there was a surveillance
2     tape.
3          And I believe the evidence will be that
4     the plan was that Delano Smith was going to
5     take care of Travis Benefield, that Willie
6     Gardner was going to take care of Ray Davis and
7     take him back and get the videotape and the
8     money that was in the office; and that Anthony
9     Fuller, the third individual, was going to be
10    the bag man.  He's the guy collecting all the
11    money.  And then, finally, Taurus Hall is going
12    to be the lookout.  He's going to be the guy
13    that stood outside that told the rest of them
14    when it was okay to come in, when the best
15    opportunity would be to strike.
16         Ladies and gentlemen, you're going to see
17    firsthand what happened in that store because
18    the plan did not exactly go off the way they
19    had intended.  You see, ladies and gentlemen,
20    when they hit that door with guns blazing, they
21    got Ray Davis -- or Willie Gardner got Ray
22    Davis up off the floor, and he marched him to
23    the back of the store while Delano Smith stood
24    over Travis Benefield and Anthony Fuller stood
25    there getting all the money out of the
```

1    register.  But in a split second, when Willie

2    Gardner got Ray Davis to the back of that

3    store, Ray wasn't moving quite fast enough for

4    Willie.

5         So what does Willie do?  He takes the gun,

6    and he discharges the gun into the floor.  At

7    that point in time, Ray Davis had to make a

8    decision.  What am I going to do?  So just

9    acting on instincts alone, he put his keys in

10   the door, he popped the door open and jerked

11   the door to the office open, and he was able to

12   get inside and throw the door latch before

13   Willie Gardner could get in.

14        But ladies and gentlemen, during that

15   process, Willie Gardner turned that gun on Ray

16   Davis, and he started shooting.  He shot Ray

17   Davis two times.  One bullet went through his

18   arm and into his stomach.  The second was a

19   straight on shot into his stomach.  But Ray was

20   able to flip the bolt on that door and to

21   prohibit Willie Gardner from coming in.

22        Ladies and gentlemen, after that door was

23   locked, Willie Gardner ran to the front of the

24   store where they continued to get money and

25   guns, because there were some guns in the store

1    that were taken as well.

2          They finished their business there.

3    Delano Smith came out from behind the counter.

4    He went to the back of the store and tried to

5    open the office, saw that it was locked, wiped

6    his fingerprints off the door, and the three --

7    or the four of these guys left together with an

8    amount of currency and a couple of handguns.

9          Now, ladies and gentlemen, the problem for

10   Willie Gardner in this case to start with was

11   that they grew up in that community.  They have

12   visited that store on a regular basis.  Ray

13   Davis, the gentleman sitting right here, was

14   very familiar with all four of these

15   individuals.  And that Ray Davis was able to

16   identify -- even though there was a

17   handkerchief across his face, was able to

18   identify Willie Gardner as being the guy that

19   turned the gun on him and shot him on two

20   occasions.

21         The second problem was the plan

22   was videotaped.  Willie Gardner was never able

23   to get inside the office where the videotape

24   was running.  Ladies and gentlemen, you won't

25   have to take my word for it.  You won't have to

1   take Ray Davis's word for it.  You can watch
2   yourself live and in person how this robbery
3   was performed.  You'll actually see the
4   surveillance videotape.  And what you will see
5   in that videotape is horrifying, because when
6   all of this was going on with Ray Davis in the
7   back of that store, Delano Smith took the gun
8   that he had while Travis Benefield was laying
9   helplessly on the floor, pointed the gun to the
10  back of his head in execution style, put two
11  rounds in the back of Travis Benefield's head,
12  taking his life.  You'll see it yourself.
13       Ladies and gentlemen, within moments of
14  the robbery, the police department was there.
15  They began their investigation.  They sent an
16  officer to the hospital where they were
17  administering life-saving treatment for the
18  injuries that Ray Davis sustained.  While Ray
19  Davis was waiting to go into the operating
20  room, he gave them the name of Wet Willie.
21  Ladies and gentlemen, Wet Willie is Willie
22  Gardner.
23       From that point, the police continued
24  their investigation.  Later on, and as the
25  evening turned into the morning hours, they

1    were able to go and arrest Willie Gardner for
2    capital murder.  Initially, Willie Gardner gave
3    them an alibi.  He said, I was with my
4    girlfriend.  But later on, I believe the next
5    day, he got word to detectives that he wanted
6    to talk to them again.  He wanted to tell them
7    the truth.
8        I believe the evidence will be that a
9    couple of detectives from the police department
10   went down, they got Willie Gardner, and they
11   took him back to the police station.  And
12   Willie Gardner sat down and gave them a full
13   statement, which was videotaped.
14       In that statement, he told them about the
15   plan to rob.  He told them that he was the one
16   that went into the store.  They sit down.  They
17   showed him the videotape.  He mitigated his
18   involvement in it, but he confessed to this
19   crime.
20       Ladies and gentlemen, that's going to be
21   the facts of this case.
22       What you're also going to hear is that
23   Willie Gardner has pled guilty in this case.
24   Now, you may be asking yourself if he has pled
25   guilty, then why are we here?  Well, ladies and

```
 1        gentlemen, in the state of Alabama when an
 2        individual is charged with capital murder -- in
 3        the state of Alabama, we have several different
 4        types of murder.  We have intentional murder.
 5        We have felony murder, but then we have capital
 6        murder, which is the most serious.  And simply
 7        put, capital murder is when an individual
 8        commits a felony offense and during the course
 9        of that felony offense, he intentionally takes
10        the life of another person.
11             Now, on this particular case, the felony
12        offense that we're referring to is robbery,
13        robbery in the first degree.  That's robbery
14        committed by the use of a gun.  And during the
15        course of that robbery, either Willie Gardner
16        or someone that he was in complicity with,
17        that's someone he was an accomplice with, the
18        Judge is going to tell you, in the State of
19        Alabama, we recognize no distinction between
20        the principal or the person pulling the trigger
21        or someone who was his accomplice, who was
22        there willing and participating in the crime.
23        But during the course of a robbery, someone
24        that was participating in that course of the
25        robbery took the life of Travis Benefield.
```

1    Ladies and gentlemen, you'll hear evidence

2    that Willie Gardner has pled to that case or

3    has pled to that offense.  And with it being

4    capital murder, even on a guilty plea, the

5    State of Alabama still has to put on a case,

6    and you as jurors have to come back with a

7    verdict.

8    The Judge is going to instruct you on the

9    law, and he's going to tell you that the things

10   that you are to consider is the testimony that

11   comes from this witness stand.  Now, ladies and

12   gentlemen, you'll hear from live witnesses.

13   You'll hear from Ray Davis.  You'll hear from

14   the case agent, Keith Barnett.  But in addition

15   to that, the Judge is going to give you some

16   instructions on stipulations.  Stipulations are

17   basically things that the State of Alabama and

18   the defense agree on as how they took place.

19   You will hear the stipulations from a number of

20   witnesses.  The Judge is going to instruct you

21   that you are to treat that testimony or that

22   stipulation just as if they were testifying

23   before you in person.

24   Ladies and gentlemen, what I'm going to

25   ask you to do is I'm going to ask you to listen

```
1         to the evidence that comes to you from these
2         witnesses.  I'm going to ask you to look at the
3         exhibits, the videotapes that you'll see, the
4         photographs that you'll see.  I'm going to ask
5         you to listen to the stipulations.  And at the
6         close of all that testimony, I'm going to ask
7         you to return a verdict of guilty against
8         Willie Gardner for capital murder, the same
9         crime that he has pled guilty to.
10            Thank you very much.
11                MR. BELSER:  Judge, the defense will
12        stipulate that we're not going to make any
13        opening remarks at this time.
14                THE COURT:  All right.
15                MS. BROOKS:  The State calls as its
16        first witness, Ray Davis.
17                     RAYMOND DAVIS
18            The witness, having first been duly sworn
19     to speak the truth, the whole truth and nothing but
20     the truth, took the stand and testified as follows:
21                   DIRECT EXAMINATION
22     BY MS. BROOKS:
23     Q.   Ray, would you tell everybody your name?
24     A.   Raymond Davis.
25     Q.   And do you still live here in Montgomery?
```

```
 1    A.   Yes, ma'am.

 2    Q.   Back on September the 3rd, 2001, Labor Day, did

 3         you live here?

 4    A.   Yes, ma'am.

 5    Q.   Did you work here?

 6    A.   Yes, ma'am.

 7    Q.   Where?

 8    A.   Premium Package Store, also known as Big Al's.

 9    Q.   Where is that?

10    A.   On Adams Avenue right in front of Tulane Court.

11    Q.   Is that in Montgomery County, Alabama?

12    A.   Yes, ma'am.

13    Q.   How long had you worked there?

14    A.   At that time, three years.

15    Q.   Was it a family-owned business?

16    A.   Yes, ma'am.

17    Q.   And is it a business that had been there about

18         30 or 35 years?

19    A.   Yes, ma'am.

20    Q.   At the time, did you have a wife, kids?

21    A.   Yes, ma'am.

22    Q.   How old are you, do you mind?

23    A.   I'm 25.

24    Q.   Twenty-five now?

25    A.   Yes, ma'am.
```

1   Q.   Back on the occasion of Labor Day of 2001 when

2        you were at work, was anybody else there with

3        you?

4   A.   Yes, ma'am.

5   Q.   Who?

6   A.   Travis Benefield.

7   Q.   Who is Travis Benefield?

8   A.   A friend of mine, co-worker, currently

9        deceased.

10  Q.   Was he about your age?

11  A.   Yes, ma'am.

12  Q.   Had you known him long?

13  A.   The entire time I had worked at Premium

14       Package.

15  Q.   You mentioned that's in front of Tulane Court?

16  A.   Yes, ma'am.

17  Q.   Is there a wall that separates the store and

18       the parking lot from Tulane Court itself?

19  A.   Yes, ma'am.

20  Q.   Do you know a fellow named Wet Willie?

21  A.   Yes, ma'am.

22  Q.   How did you know him?

23  A.   He was a regular customer in the store.  He

24       would come in and buy sodas, stuff like that.

25  Q.   Do you recognize the name Pop?

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | How do you know him? |
| 3 | A. | He was also a regular in the store. |
| 4 | Q. | Prior to that Labor Day, had there been any |
| 5 | | difficulties, to your knowledge, about Pop or |
| 6 | | Wet Willie and the store? |
| 7 | A. | I knew there had been some animosity as far as |
| 8 | | them hanging on the lot, us having to ask them |
| 9 | | to leave, stuff like that. |
| 10 | Q. | Were they under age for drinking? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | What does your store primarily sell? |
| 13 | A. | Alcoholic beverages. |
| 14 | Q. | Was there a bar in there, some stools that |
| 15 | | people could actually drink at? |
| 16 | A. | Yes, ma'am. |
| 17 | Q. | About eight o'clock that night, who was |
| 18 | | working? |
| 19 | A. | Me and Travis. |
| 20 | Q. | All the other -- the owners and the other |
| 21 | | clerks had gone? |
| 22 | A. | Yes, ma'am. |
| 23 | Q. | Do you know a fellow named Taurus Hall? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | Had you seen him that night? |

```
1    A.   Yes, ma'am.

2    Q.   After he left, what happened?

3    A.   He come in, bought a pack of cigarettes, left,

4         and then three people entered the store with

5         guns, starting shooting.  Travis got shot twice

6         in the side.

7    Q.   How do you know that?

8    A.   When everything happened, we both hit the

9         ground and Travis said that he had been hit.

10        And I said, where?  And he said, in the side.

11        And he moved his shirt up a little bit, and I

12        saw the pool of blood.

13   Q.   Could you tell anything about how these three

14        men were dressed?

15   A.   They were all wearing primarily dark clothes,

16        had masks covering the lower part of their

17        face.

18   Q.   When they first came in, how were they acting?

19        What were they doing?

20   A.   There was a lot of screaming, a lot of

21        hollering, telling us to shut up, you know.

22   Q.   What was said before Travis was actually shot

23        that first time?

24   A.   When they first came around the counter, he

25        told them, he said, take whatever you want,
```

```
 1           just don't kill us.
 2     Q.    And was this before he was shot or after?
 3     A.    This was before he was killed.
 4     Q.    Before he was killed?
 5     A.    Yes, ma'am.
 6     Q.    What I'm trying to understand is you said three
 7           men came into the store.  Now, when they came
 8           in, did you see any guns?
 9     A.    Yes, ma'am, as soon as the door opened, they
10           come through with guns firing.
11     Q.    Firing.  Okay.  And that's when Travis was
12           initially hit in the side?
13     A.    Yes, ma'am.
14     Q.    But he didn't pass out right then?
15     A.    No, ma'am.
16     Q.    He was able to tell you what?
17     A.    That he had been hit in the side.
18     Q.    And then you said he said something else to
19           somebody who had a gun on him?
20     A.    Yes, ma'am.
21     Q.    What did he say?
22     A.    He said, take whatever you want, just don't
23           kill us.
24     Q.    What happened while he was begging?
25     A.    They come around, got me off the floor, told me
```

```
 1          to go into the back room, open up the safe.
 2    Q.   Did anybody go with you?
 3    A.   Yes, ma'am.
 4    Q.   Who?
 5    A.   Wet Willie.
 6    Q.   How do you know who it was?
 7    A.   Because when he came in and got me up off the
 8          floor, I got a good look at his face, and I was
 9          able to recognize him.
10    Q.   And he told you to go where?
11    A.   Go to the back of the store and open up the
12          safe.
13    Q.   What's in the back of that store?
14    A.   The office.
15    Q.   And by office, could you describe it generally
16          for us?
17    A.   It's about a five foot by 10 foot enclosed area
18          where the store safe, records were kept.
19    Q.   Was it -- have a door on the office?
20    A.   Yes, ma'am.
21    Q.   Was it kept open or locked?
22    A.   It was kept locked.
23    Q.   Did you have a key?
24    A.   Yes, ma'am.
25    Q.   There's a safe.  Do you mean a safe like we
```

```
 1        normally think of one?
 2   A.   Yes, ma'am.  It was probably about five foot
 3        high, about 350, 400 pound safe.
 4   Q.   What was kept in that safe?
 5   A.   The store money, store records.
 6   Q.   Did the store ever use cash in its business to
 7        check -- to cash checks?
 8   A.   Yes, ma'am.
 9   Q.   Is that a primary source of income?
10   A.   Yes, ma'am.
11   Q.   And in that office, was there any surveillance
12        equipment?
13   A.   Yes, ma'am.
14   Q.   What?
15   A.   There was a camera inside the office.  There
16        was the VCR and there was also the monitor.
17   Q.   So this surveillance camera actually recorded
18        what you could see through the cameras?
19   A.   Yes, ma'am.
20   Q.   And you could see -- watch on the monitor as
21        well?
22   A.   Yes, ma'am.
23   Q.   The -- when you went back to the store -- to
24        the office in the back of the store, describe
25        what happened.
```

1    A.    I got back to the office, was trying to get my
2          keys off my side to unlock the door.
3          Obviously, I wasn't moving quick enough for his
4          likings, and he discharged the weapon into the
5          ground close to my feet.  And I said, hold on a
6          minute, you know.  I got the keys off my side,
7          got the door unlocked.  And when I got the door
8          unlocked, I slipped inside.  And as I was
9          slipping inside, I was shot, got the door
10         closed, couldn't get it to lock.  The door was
11         snatched open again and was shot an additional
12         time and finally got the door to close, locked
13         the door, picked up the phone and called 911.
14   Q.    Okay.  You called for help?
15   A.    Yes, ma'am.
16   Q.    And were you able to get someone on 911?
17   A.    Yes, ma'am.
18   Q.    Did you stay on that line until help arrived?
19   A.    Yes, ma'am.
20   Q.    From that moment that you left the front of the
21         store where you had heard your friend Travis
22         begging not to be shot again until now, have
23         you seen Travis again?
24   A.    No.
25   Q.    To your knowledge, he died there at the scene?

```
1    A.   Yes, ma'am.

2    Q.   Was money missing from the store after this

3         night?

4    A.   To my knowledge, yes, ma'am.

5    Q.   And there were some guns kept in the store,

6         weren't there?

7    A.   Yes, ma'am.

8    Q.   What about Travis, did he have a gun?

9    A.   Yes, ma'am.

10   Q.   What was it for?

11   A.   Personal protection.

12   Q.   Were there any guns kept up under the counter

13        where the registers were?

14   A.   Yes, ma'am.

15   Q.   And were any guns missing that night?

16   A.   Yes, ma'am.

17   Q.   When the police got there, did the paramedics

18        attempt to treat you?

19   A.   Yes, ma'am.

20   Q.   And then were you transported to the hospital?

21   A.   Yes, ma'am.

22   Q.   Would you share with the ladies and gentlemen

23        of the jury where were you shot?  You don't

24        have to show us the marks.

25   A.   Was shot once in the right forearm, then
```

```
1          received multiple gunshot wounds to the
2          abdomen, two or three times.
3     Q.   The forearm, did you have any loss of use of
4          that arm?
5     A.   Yes, ma'am.
6     Q.   Explain that.
7     A.   When it first happened, naturally, they put it
8          in a cast.  When they removed the cast, I had
9          probably about 30 percent use of it.  I had no
10         strength in it.  Then, gradually, as time
11         progressed on, I managed to get some of the use
12         back.  I'm still not at one hundred percent
13         with it.
14    Q.   And what about the wounds to your abdomen, did
15         they require any surgery?
16    A.   They did, yes, ma'am.
17    Q.   How many surgeries have you had?
18    A.   Four altogether.
19    Q.   Did you lose any of your guts?
20    A.   Yes, ma'am.  I lost 70 percent of my large
21         intestines, 10 percent of my small intestines.
22         A bullet grazed my liver.  I suffered
23         contusions to my heart and lung.
24    Q.   For a period of time as a result of what
25         happened to you, did you have to wear any kind
```

```
 1           of special equipment?
 2    A.     Yes, ma'am.  I had to be equipped with a
 3           colostomy bag.
 4    Q.     You're recovering now from those injuries?
 5    A.     Yes, ma'am.
 6    Q.     After you called for help and you went to the
 7           hospital, before you went into surgery, do you
 8           remember a police officer asking you briefly
 9           about what happened?
10    A.     Yes, ma'am.
11    Q.     Were you able to tell him any of the names of
12           the people that night?
13    A.     One of them.
14    Q.     Who was that?
15    A.     That was Wet Willie.
16    Q.     After that night, you began recovering from
17           what happened.  About, gosh, a year, year and a
18           half later, did you go back to Baptist Hospital
19           to have a further procedure done?
20    A.     Yes, ma'am.
21    Q.     Okay.  Specifically, I think it was around
22           April, 1st of April of 2002?
23    A.     Yes, ma'am.
24    Q.     Something happened.  You felt something in your
25           back?
```

```
 1    A.    Yes, ma'am.

 2    Q.    Tell us about that.

 3    A.    I had noticed a small bump located on my --

 4          right around my kidney area, and I didn't think

 5          nothing of it.  And as it progressed on, I took

 6          my binder off one night, was getting ready to

 7          get a shower.  And I told my wife, I said, we

 8          need to go to the emergency room.  And she said

 9          why.  And I said the bullet -- that one of the

10          bullets that was lodged inside of me has worked

11          its way out.  And I went to Baptist Medical

12          Center that night and had it removed.

13    Q.    They removed that bullet?

14    A.    Yes, ma'am.

15    Q.    Handed it to you?

16    A.    Yes, ma'am.

17    Q.    Were you conscious when they took it out?

18    A.    Yes, ma'am.

19    Q.    And what did you do with it?

20    A.    I wrapped it up in gauze, put it in a pill

21          bottle and turned it over to Montgomery Police

22          Department.

23    Q.    Do you know a detective named E. E. Howton,

24          Geno Howton?

25    A.    Yes, ma'am.
```

```
 1    Q.   Is that who you gave it to?

 2    A.   Yes, ma'am.

 3    Q.   Did you do anything to it to change its

 4         appearance in any way?

 5    A.   No, ma'am.

 6    Q.   Let me begin by showing you State's Exhibit 2

 7         and ask if you recognize what that appears to

 8         be a sketch of?

 9    A.   Yes, ma'am.  That appears to be a sketch of the

10         layout of the package store.

11    Q.   Okay.  I always do this backwards.  I'm sorry.

12         If you'll direct me, I'll do the pointer, and

13         we'll start here at the top where it's labeled

14         421 Yougene Curve, R-1 and wall.  Do you see

15         that?

16    A.   Yes, ma'am.

17    Q.   Now, go to the opposite end where there is an

18         opening.

19    A.   Yes, ma'am.

20    Q.   Are you familiar with what that is?

21    A.   Yes, ma'am.  That would be the front of the

22         store, the front door.

23    Q.   And then to the left were these R numbers are

24         around this rectangular block, what would that

25         represent?
```

| | | |
|---|---|---|
| 1 | A. | That would represent the counter and the bar. |
| 2 | Q. | And where would Travis have been at the time |
| 3 | | that he was shot? |
| 4 | A. | On the back side of it towards the left-hand |
| 5 | | side. |
| 6 | Q. | In this area where it's labeled -- all these R |
| 7 | | numbers are? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | And you said you were taken to the back down |
| 10 | | the hall? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | Where would that be? |
| 13 | A. | Follow from where Travis would have been |
| 14 | | laying. |
| 15 | Q. | Okay. |
| 16 | A. | Down the back. |
| 17 | Q. | Okay. |
| 18 | A. | Over to the right and then down that little |
| 19 | | hallway right there. |
| 20 | Q. | Am I going the right way? |
| 21 | A. | Yes, ma'am. |
| 22 | Q. | Right here would be the storage area.  Over |
| 23 | | there would be the office where it says R-20? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | And that's where you ended up calling for help? |

```
1    A.   Yes, ma'am.

2    Q.   Okay.  The store -- just to make sure we're all

3         talking about the same place -- is State's

4         Exhibit 3.  Can you see that?

5    A.   Yes, ma'am.

6    Q.   Is that the same store we're talking about?

7    A.   Yes, ma'am.

8    Q.   Okay.  And the signage says Premium Package

9         Store, but it was also called Big Al's?

10   A.   Yes, ma'am.

11   Q.   Is that the front door that you can see on the

12        other side of the vehicle?

13   A.   Yes, ma'am.

14             THE COURT:  That's here in Montgomery

15        County on what street again?

16             THE WITNESS:  Adams Avenue.

17             THE COURT:  And that's Montgomery

18        County?

19             THE WITNESS:  Yes, sir.

20   Q.   Let me show you what's marked as State's

21        Exhibit 1 -- State's 1 -- State's 1 and ask you

22        if this looks like the type of tape that was

23        the surveillance tape?

24   A.   Yes, ma'am.

25   Q.   Okay.  You weren't there when the police took
```

```
 1           it, were you?
 2    A.     No, ma'am.
 3    Q.     You mentioned you called 911.  They record
 4           those calls.  State's Exhibit 20, does that
 5           appear to be your 911 call?
 6    A.     Yes, ma'am.
 7    Q.     I just cut the top of the label off an item,
 8           State's 32 labeled B-1.  Do you see that?
 9    A.     Yes, ma'am.
10    Q.     It has some other identifying information on
11           it.  I'm going to open it up.  And there's
12           another envelope, and I'm going to open that.
13           And inside that envelope is another envelope,
14           and it has the date of April the 3rd, '02?
15    A.     Yes, ma'am.
16    Q.     And it's labeled projectile from Raymond
17           Davis.  That's you?
18    A.     Yes, ma'am.
19    Q.     Okay.  I'm going to open that up.  And inside
20           appears to be a bullet.  Does that look like
21           what came out of your back?
22    A.     Yes, ma'am.
23    Q.     The law requires, Ray, that we prove that the
24           person who is dead is the person you've been
25           talking about.  So I'm going to show you a
```

```
 1          picture that's marked as State's Exhibit 13 and
 2          ask you who is that?
 3   A.     That would be Travis Benefield.
 4   Q.     Okay.  Thank you, Ray.  The last question we
 5          have is the man you referred to as Wet Willie,
 6          Willie Gardner, is he in the courtroom?
 7   A.     Yes, ma'am.
 8   Q.     Could you describe where he is and what he's
 9          wearing?
10   A.     He is sitting to the right-hand side of me.  He
11          is wearing a pair of khaki pants and a dark
12          blue shirt.
13              MS. BROOKS:  Thank you, Ray.  That's
14          all we have.
15              MR. BELSER:  No questions, Your Honor.
16              THE COURT:  Thank you, sir.
17                  (The witness was excused
18                   from the witness stand.)
19              MS. PERKINS:  We're going to go
20          through -- next is going to be the stipulation
21          of Tawaskie Williams.  Tawaskie Williams is 18
22          years old, and his nickname is Solo.  He knows
23          the defendant seated over here at counsel table
24          as Willie Gardner, and he would have identified
25          Willie Gardner as being Wet Willie if he were
```

1    in the courtroom today.  He also knows his

2    co-defendants, Delano Smith.  He knows him as

3    Pop.  Anthony Fuller, he knows him as Ant; and

4    Taurus Hall, he knows him as Big Bug.

5        Days before the shooting, Tawaskie heard

6    Willie Gardner, Wet Willie, Pop all talking

7    about robbing the Premium Package Store that

8    everybody commonly refers to in that

9    neighborhood as Big Al's.

10       Tawaskie Williams would have identified

11   State's Exhibit 3 as being Big Al's, that he

12   heard the defendant Pop and Ant talking about

13   robbing.

14       On September 3rd of 2001, which was the

15   date of this robbery and murder, Tawaskie, Wet

16   Willie, Pop and Ant were at a dice game on the

17   porch of an empty house in the neighborhood.

18   There was a party going on at Tawaskie's

19   mother's house, Bridgette Williams, and

20   Tawaskie left that party and went over to the

21   dice game.

22       At the game, Tawaskie heard Wet Willie,

23   Pop and Ant talking again about robbing Big

24   Al's.  He saw them with guns, and he saw them

25   loading the guns with bullets.  He saw this

1    defendant, Wet Willie, with a .40 caliber gun;

2    and he saw Pop, another one of the

3    co-defendants, Delano Smith with a chrome nine

4    millimeter gun.  Wet Willie, Pop and Ant asked

5    Tawaskie if he would participate in the

6    robbery, and Tawaskie said no.

7        After the game ended, Pop, Wet Willie, and

8    Ant left and went to Wet Willie's house, this

9    defendant's house, while Tawaskie went to his

10   mom's house, which was nearby in the

11   neighborhood and sat on the porch.  When

12   Tawaskie saw this defendant Wet Willie and Pop

13   again, they had changed clothes.  Wet Willie

14   had on black jeans and a black shirt.  Pop had

15   on blue jeans and blue jogging pants and a blue

16   shirt, and Ant had on blue jeans and a white

17   shirt.  They all asked him again if he wanted

18   to participate in the robbery, and Tawaskie

19   said no.  He refused, and he saw all the

20   co-defendants leave.

21       Tawaskie was near this store when the

22   shooting took place, and he actually heard the

23   gunshots.  Moments later, he saw Wet Willie,

24   this defendant; Pop and Ant jump over a brick

25   wall behind the store with masks over their

face carrying guns.

Tawaskie would identify State's Exhibit 11 as being the wall. The wall is actually going to be to this side. This is going to be the side of the building, but to the back right here, he would identify this as being the wall that they actually jumped over, the wall that leads to Tulane Court. Tawaskie said he saw them -- his testimony would be that he saw them act as if they dropped something, saw them act as if they wanted to pick it up, but they decided not to, and they took off running to what he refers to as the cut.

Tawaskie's testimony would have also been -- well, actually, it also is that he would identify Willie Gardner, the defendant, here in this courtroom today as being Wet Willie.

Trying to focus just a little bit to give you an idea of what the witnesses -- the stipulations that have been given. That was the testimony of Tawaskie Williams.

Next, we have the testimony of Mickey Phillips, who is the store owner. Mickey Phillips is the owner of Premium Package Store, which is commonly referred to again as Big

1    Al's. His testimony would be that Big Al's was

2    a family store that had been in existence for

3    about 25 years. The store is located at 1114

4    Adams Avenue here in Montgomery County right

5    near Tulane Court by the Church's Chicken

6    that's on Adam's Avenue.

7        The victims, Travis Benefield and Ray

8    Davis, were both employees at the store. His

9    testimony would be that Travis Benefield kept a

10   gun near the register. Money and gun were

11   missing from the store after the robbery and

12   the store -- his testimony would be that the

13   store is equipped with a video surveillance

14   system. Videotapes were recorded and kept as a

15   regular course of business activity for

16   external theft, people coming in doing

17   something to the business and for any possible

18   internal thefts.

19       Mickey's testimony is that the video

20   surveillance system was working at the time of

21   this robbery on September 3rd, 2001 and that

22   this incident was actually recorded. Mickey

23   Phillips reviewed the tape and observed that

24   the date and the time that were actually

25   recorded on the videotape were wrong. But his

1    testimony is that the date and time were

2    actually wrong prior to the shooting.

3        The cameras in the store are located in

4    four places.  Therefore, on the video, the

5    surveillance video that you're going to get a

6    chance to watch, there are going to be four

7    frames shooting simultaneously.  The video is a

8    time-lapsed video so when it's played, it plays

9    faster than in real time.

10       Mickey Phillips would identify State's

11   Exhibit 2 as a layout of his store.  He would

12   identify State's Exhibit 3 as the front of the

13   store.  And he would also identify State's

14   Exhibit 1 as the surveillance tape that

15   recorded the events on the date in question.

16       Judge, we offer State's Exhibit 1 at this

17   time.

18            THE COURT:  I'm sorry?

19            MS. PERKINS:  We offer State's Exhibit

20   1 at this time.

21            MR. BELSER:  No objection.

22            THE COURT:  It's admitted.

23                 (State's Exhibit 1 was admitted

24                 into evidence.)

25            MS. PERKINS:  Next would be the

testimony of Officer B. F. Harrison.  Officer
Harrison is employed with the Montgomery Police
Department.  He currently works in the
detective division, but back in September of
2001, he worked in the patrol division.

On Labor Day, September 3rd of 2001,
Officer Harrison was on duty, and he was
actually patrolling his district, which is that
area where Tulane Court is when he received a
call of a robbery at the Premium Package
Store.

He arrived on the scene, and he observed
the victim, Travis Benefield, lying on the
floor behind the counter with what appeared to
be multiple gunshot wounds.  He and other
patrol officers that came on the scene with him
looked through the scene to see if there were
any other wounded victims.  He found Ray Davis
in the back office.  And then Officer Harrison
began to secure the scene as departmental
policy requires that they do when they get to
an incident where a crime takes place.  And
they do this to ensure that no evidence from
the crime scene is tampered with or
contaminated.

1          Officer Harrison also began to speak with

2     witnesses on the scene, and he remained at the

3     scene until medical personnel arrived and

4     tended to the victim and detectives that came

5     to investigate the crime scene.  He would also

6     identify State's Exhibit 3 to be the store

7     where he arrived when he got the call to be

8     Premium Package Store.

9          Next would be the stipulation of Officer

10     Huett.  W. R. Huett was employed back in

11     September of 2001 at the Montgomery Police

12     Department as an evidence technician.  He is

13     currently retired after 20 years of working

14     with the department.  Now he's at the Alabama

15     State Board of Licensure for Professional

16     Engineers.

17          The duties of an evidence technician,

18     which was his job back at the time of this

19     incident, is to document what happened at the

20     crime scene, document what he sees, to collect

21     and preserve evidence for testing and preserve

22     the evidence for trial.  And back on Labor Day

23     of 2001, Officer Huett got a call to come and

24     handle this crime scene at Premium Package

25     Store.  He arrived on the scene about 9:30 p.m.