1    and when he arrived, he found the scene

2    secured.  He learned that it was secured by

3    Officer Harrison.

4        He reviewed the scene and then took

5    photographs.  He also took a video of the crime

6    scene, and then he walked the crime scene and

7    began to collect evidence.  A crime scene

8    diagram was done by was Officer Huett to show

9    the location of different pieces of evidence at

10   the scene.  He would have identified State's

11   Exhibit 2 to be the crime scene that he drew to

12   show where the evidence was.  And his testimony

13   would be that this would be a fair and accurate

14   depiction of the crime scene as he saw it at

15   the time.

16        MS. PERKINS:  Judge, we offer State's

17   2.

18        MR. BELSER:  No objection.

19        THE COURT:  It's admitted.

20        (State's Exhibit 2 was admitted

21        into evidence.)

22        MS. PERKINS:  I'm not that

23   technologically advanced, so -- Officer

24   Huett -- this would be State's Exhibit 16.

25   That's the crime scene video that he made.  And

1   his testimony would be that this video fairly

2   and accurately depicts the scene as he saw it

3   and that it would aid you-all in understanding

4   what the crime scene looked like at the time of

5   the incident in question.

6        Judge, we offer State's 16.

7            MR. BELSER:  No objection.

8            THE COURT:  It's admitted.

9                (State's Exhibit 16 was admitted

10               into evidence.)

11           THE COURT:  How long does this take?

12           MR. KIDD:  It's 20 minutes.

13           THE COURT:  Okay.  We've been 55.

14   Let's go ahead and take a break.  I'm going to

15   give you a break now before you see the

16   videotape.  Let me again remind you not to

17   discuss the case among yourselves or with

18   anyone else, and we'll see you back in the jury

19   assembly room in 10 minutes.  Jury assembly

20   room in 10 minutes, not here but the assembly

21   room.

22               (Short recess.)

23           THE COURT:  All right.

24           MS. PERKINS:  Back in the stipulation

25   of W. R. Huett.  He just identified State's

1    Exhibit 16 as being the crime scene video.

2         THE COURT:  Y'all approach one

3    second.  Come up here second one.

4              (The following occurred at the

5              bench outside the hearing of the

6              jury:)

7         THE COURT:  Do you want this reported

8    or not reported?

9         MR. KIDD:  Not reported.

10        MR. BELSER:  Not reported.  That will

11   be fine.

12             (Videotape was played in open

13             court.)

14        MS. PERKINS:  Officer Huett would

15   identify Exhibits 3 through 12 as the crime

16   scene photos that he took as he walked through

17   the scene.  The photos fairly and accurately

18   depict the crime scene as he saw it.  State's

19   Exhibit 3 --

20   Judge, we offer State's Exhibits 3 through

21   12.

22        MR. BELSER:  No objection.

23        THE COURT:  Three through 12?

24        MS. PERKINS:  Yes, sir.

25        THE COURT:  They are admitted.

```
 1                    (State's Exhibits 3, 4, 5, 6, 7,
 2                8, 9, 10, 11 and 12 were admitted
 3                into evidence.)
 4           MS. PERKINS:  State's 3 is a photo of
 5      the exterior front of the store.  State's
 6      Exhibit 4 is a picture of the interior of the
 7      store looking from the front of the store to
 8      the back.  State's Exhibit 5 -- State's Exhibit
 9      5 is a photo of the interior of the store
10      looking from the back of the store to the front
11      of the store.  State's Exhibit 6 is a photo of
12      the cash register of the store looking from the
13      front.  State's Exhibit 7 is a photo of the
14      register of the store looking toward the back
15      of the store.  State's Exhibit 8 is a distant
16      photo of the victim's body.  State's Exhibit 9
17      is a close-up photo of the victim's body.
18      State's Exhibit 10 is a close-up photo of the
19      wound, the fatal wound to the victim's head.
20      State's Exhibit 11 is that photo previously
21      shown of the wall between the store and Tulane
22      Court.  And State's Exhibit 12 is a photo taken
23      by Officer Huett of that gun on the other side
24      of the wall between the store and Tulane
25      Court.
```

1          Officer Huett would also identify State's

2    Exhibit 17 -- 17-A.  He would identify 17-A as

3    the gun shown in that picture and the gun that

4    was found on the other side of that wall.  His

5    testimony would be that State's Exhibit 17,

6    this gun, is in the same or substantially the

7    same condition as when he last saw it.

8         Judge, we offer 17-A.

9           MR. BELSER:  No objection.

10          THE COURT:  It's admitted.

11             (State's Exhibit 17-A was

12             admitted into evidence.)

13          MS. PERKINS:  Officer Huett would

14    identify State's Exhibit 17-B and 17-C as being

15    the magazine that was inside of the gun and

16    17-C as being the one unfired bullet that was

17    still in the gun when it was retrieved.  17-B

18    and C are both in the same or substantially

19    same condition as when he retrieved it.

20         Judge, we offer 17-B and C.

21           MR. BELSER:  No objection.

22          THE COURT:  They're admitted.

23             (State's Exhibits 17-B and 17-C

24             were admitted into evidence.)

25          MS. PERKINS:  Officer Huett would also

1    identify State's Exhibit 21, 22, 23, 24, 25,

2    26, 27, 28, 29 and 30 as being the shell cases

3    that were recovered at the scene.  His

4    testimony would be that all these shell cases

5    were in the same or substantially same

6    condition as when he retrieved them.

7        Judge, we offer State's Exhibit 21, 22,

8    23, 24, 25, 26, 27, 28, 29 and 30.

9            MR. BELSER:  No objection.

10           THE COURT:  They're admitted.  Hold on

11   one second so she can write that down.

12               (State's Exhibits 21, 22, 23, 24,

13               25, 26, 27, 28, 29 and were

14               admitted into evidence.)

15           MS. PERKINS:  This is State's Exhibit

16   21 that I'm showing you, and Officer Huett

17   would identify State's Exhibit 21 through 30 as

18   being shell cases.  This is what a shell case

19   looks like.

20       The victim's body was turned over to Scott

21   Belton at the Department of Forensic Sciences,

22   who transported it to the morgue.

23       The surveillance tape, which was

24   identified as State's Exhibit 1, was taken from

25   the owner of the package store and was given to

1    Detective Barnett, and it was secured in police
2    impound.  He would identify State's Exhibit 1
3    to be the surveillance video that he got from
4    the owner of the store and took to the police
5    impound to keep it secure.
6        I'm going to walk you through what Officer
7    Huett's testimony would be as to where these
8    shell cases were found.  R-2 would be a shell
9    casing found over here behind where the
10   victim's body, Travis Benefield, was found.
11   R-3 would be a casing that was found as we
12   walked in the door.  R-4 would be a casing that
13   was found on the side of the register that's
14   coming into the store.  R-5 would be one of the
15   casings that was found as you're heading toward
16   the back of the store.  R-6 would be one of the
17   cases that's found as you're going past the
18   coolers on towards the back of the store.  R-14
19   would be one of the cases that's found
20   beside -- behind the victim's body.  R-15 is
21   another casing behind the victim' body.  R-8 is
22   the casing that's found back as you are going
23   toward the back of the building.  R-9 is
24   another casing that's found on the back toward
25   where the victim, Ray Davis, going toward the

1    back of the office area.  And R-10 is another

2    casing that's found back in that area.

3        Officer Huett found a total of 10

4    casings.  And the casings, along with the gun,

5    were collected and turned over to the

6    Department of Forensic Sciences for testing,

7    and they were secured.

8        Next would be the stipulation of Corporal

9    Bowman, J. M. Bowman.  Corporal Bowman is

10   employed with the Montgomery Police Department

11   as an evidence technician, also.

12       On April 23rd, 2002, Detective Howton

13   requested that Corporal Bowman collect a lead

14   projectile which was recovered from the victim,

15   Ray Davis, from the evidence supply room and

16   submit it to the Department of Forensic

17   Sciences for testing.  Officer Bowman collected

18   that projectile.  And that particular

19   projectile that was taken from Ray Davis was

20   released to Joseph Saloom of the Department of

21   Forensic Sciences for testing.

22       Corporal Bowman would identify State's

23   Exhibit 32 as the projectile that was taken

24   from the victim.

25       Next is the stipulation for Scott Belton.

1    Scott Belton is employed with the Alabama

2    Department of Forensic Sciences as a forensics

3    investigator.  The Alabama Department of

4    Forensic Sciences is the state crime lab, an

5    independent group of experts who examine items

6    for evidence such as body, blood, guns, hair

7    and drugs.

8        One of the duties of a forensics

9    investigator is to get bodies from the scene of

10   a crime and transport it to the Department of

11   Forensic Sciences for a post-mortem

12   examination, commonly known as an autopsy.

13       On September the 3rd of 2001, Scott Belton

14   was called to the scene, this Premium Package

15   Store, this incident, to retrieve the body of

16   Travis Benefield.  The scene was secured when

17   he arrived.  He took custody of Travis

18   Benefield's body and then transported the body

19   to DFS for an autopsy examination.  The body

20   was not altered before the autopsy.

21       He will identify State's Exhibit 3 as the

22   store that he went to to get the body, identify

23   State's Exhibit 9 as the body that he

24   transported.  He would identify State's Exhibit

25   13 as that same body.

1    Next is the stipulation of Dr. Ben

2  Bristol.  Dr. Bristol is a medical doctor and

3  expert in forensic pathology.  In September of

4  2001, Dr. Bristol was employed with the Alabama

5  Department of Forensic Sciences as deputy

6  medical examiner.

7    A medical examiner is a doctor that

8  performs autopsies, which is the external and

9  internal examination of a body to determine the

10  cause of death.  Dr. Bristol is the doctor that

11  performed the autopsy on the victim, Travis

12  Benefield, and he followed departmental

13  protocol in doing so.

14    Dr. Bristol found during his examination

15  that Travis Benefield had two gunshot wounds to

16  his head, two gunshot wounds of his abdomen,

17  and a grazed wound on his right forearm.  In

18  his expert opinion, Dr. Bristol determined the

19  cause of death to be multiple gunshot wounds.

20    During his examination, Dr. Bristol

21  recovered a bullet fragment from the head of

22  Travis Benefield, which he secured and turned

23  over for firearms examination.

24    He would identify State's Exhibit 31 to be

25  the bullet that he recovered from the

1    victim, Travis Benefield's head.  His testimony

2    would be this bullet is in the same or

3    substantially same condition as it was when he

4    retrieved it from the victim's body.

5        We offer State's 31.

6        MR. BELSER:  No objection.

7        THE COURT:  It's admitted.

8        (State's Exhibit 31 was admitted

9        into evidence.)

10       MS. PERKINS:  Dr. Bristol prepared a

11   written report of his finding with diagrams,

12   which he signed.

13       Dr. Bristol would identify State's Exhibit

14   18 as a fair and accurate copy of his report,

15   the report in which he documented the findings,

16   finding the cause of the death of Travis

17   Benefield to be multiple gunshot wounds.

18       Dr. Bristol would identify State's Exhibit

19   13 through 15 as photos that were taken during

20   his autopsy and that they fairly and accurately

21   depict the wounds on Travis Benefield.

22       Judge, we offer State's 13 through 15.

23       MR. BELSER:  No objection.

24       MS. PERKINS:  State's 13 is a photo of

25   the body that he examined.

1             THE COURT:  Hold on.  Let me let her

2    write it down as we go.  13 and 15 are

3    admitted.

4             MS. PERKINS:  13, 14 and 15.

5             THE COURT:  13, 14 and 15 are

6    admitted.

7                (State's Exhibits 13, 14 and 15

8                were admitted into evidence.)

9             MS. PERKINS:  State's Exhibit 13 is a

10    photo of the body he examined.  14 shows the

11    abdominal entrance wounds.  15 is a photo of

12    the two exit wounds.  And State's Exhibit 10

13    shows the most serious gun wound, which is the

14    gunshot wound to the head.

15      Judge, we offer State's 10.

16             MR. BELSER:  It's been admitted, but

17    no objection.

18             MS. PERKINS:  We offer State's 18.

19             MR. BELSER:  No objection.

20             THE COURT:  Hold on one second.  18 is

21    admitted.  Give us a second to write it down,

22    Ms. Perkins.

23             MS. PERKINS:  Yes, sir.

24                (State's Exhibit 18 was admitted

25                into evidence.)

1          MS. PERKINS:  Next we have the

2     stipulations for Joe Saloom.  Joe Saloom is an

3     expert in the field of forensic firearms

4     examination, and he works at the Department of

5     Forensic Sciences.

6          Joe Saloom tested the gun that was found

7     by the wall and the cases and projectiles that

8     were found in the store that were submitted by

9     the evidence technician, Officer Huett.  He

10    also tested the bullet fragment that was found

11    from the head of Travis Benefield that was

12    submitted by Dr. Bristol, and he tested the

13    bullet that was found in Ray Davis's body.  All

14    items were tested and submitted in secure

15    condition.

16         Using the protocol for testing these

17    items, Joe Saloom, in his expert opinion,

18    determined that seven cases were fired through

19    the gun, the Ruger nine millimeter handgun.  He

20    also determined that three more of the casings

21    could have been fired through the gun, but the

22    results of the test were inconclusive.  But

23    they were consistent with coming from another

24    gun of a similar type.

25         Joe Saloom determined that the fragment

1    that was found in Travis Benefield's head was

2    fired through this same Ruger nine millimeter

3    gun.

4        He determined that the bullet from Ray

5    Davis's back could have been fired through this

6    gun, but the results were inconclusive.  The

7    results were consistent with coming from

8    another gun of a similar type.

9        Joe Saloom prepared a written report of

10   his findings, which he signed.  State's Exhibit

11   19-A is a copy of Joe Saloom's report

12   documenting his findings.  State's Exhibit 19-B

13   is another copy of a report documenting some

14   additional -- documenting additional findings.

15   Both of those reports are in the same or

16   substantially same condition, and they fairly

17   and accurately document what he found during

18   his studies and during his tests.

19       Judge, we offer State's 19-A and B.

20           MR. BELSER:  No objection.

21           THE COURT:  They're admitted.

22               (State's Exhibits 19-A and 19-B

23               were admitted into evidence.)

24           MS. PERKINS:  Next, we have the

25   stipulations of fact for Detective Howton.

1    Detective E. E. Howton is a detective with the

2    Montgomery Police Department in the

3    robbery/homicide division, and he participated

4    in the investigation of the robbery/shooting

5    that occurred at the Premium Package Store.

6         Detective Howton, along with several other

7    investigators, obtained the address of the

8    defendant, Willie Gardner, as he was developed

9    as a suspect and went to his house to look for

10   him.  At his house, they came in contact with

11   his mother, Felicia Gardner, and told her that

12   they were looking for the defendant in

13   reference to a robbery that occurred at Premium

14   Package Store.

15        The defendant's mother, Ms. Gardner,

16   allowed Detective Howton and the other

17   investigators to go into the house and to look

18   for the defendant, but they were unable to

19   locate him.  Detective Howton asked the

20   defendant's mom to bring him to headquarters if

21   she was able to locate him, and Ms. Gardner

22   told Detective Howton that she would.

23        On September 4th of 2001 at about 3:30 in

24   the morning, Ms. Gardner brought the defendant

25   to headquarters.  Detective Howton took the

1    defendant to an interview room.  He obtained

2    information from him that he put on a document

3    called a witness locator.  He took a picture of

4    the defendant, and he prepared a right's form

5    for the defendant's interview.  The defendant,

6    the witness locator, the right's form was all

7    turned over to Detective Barnett for an

8    interview.

9         State's Exhibit 33 is the right's form.

10   That would be -- it's the witness locator that

11   would be identified by Detective Howton, the

12   information that he got from the defendant, Wet

13   Willie.  State's Exhibit 14 -- 34, pardon me --

14   is the juvenile right's form.  State's Exhibit

15   35 would be identified as the photo that was

16   taken of the defendant.

17        Detective Howton also received a bullet

18   from Ray Davis that was taken from Mr. Davis's

19   body.  Detective Howton secured the bullet,

20   impounded it to be taken to the Department of

21   Forensic Sciences for firearm's examination.

22   Detective Howton would identify State's Exhibit

23   32 as being the bullet that he got from Ray

24   Davis.  And that is a fair -- that it's in the

25   same or substantially same condition as when he

1    got it from Ray Davis.

2        Judge, we offer State's Exhibit 32.

3            MR. BELSER:  No objection.

4            THE COURT:  It's admitted.

5                (State's Exhibit 32 was admitted

6                into evidence.)

7            MS. PERKINS:  Next would be the

8    testimony of Sergeant S. A. Martino.  Detective

9    Martino is a robbery/homicide detective with

10   the Montgomery Police Department.

11        On September 4th, 2001, at about 4:20 a.m,

12   Detective Martino was at headquarters assisting

13   in the investigation of this robbery/homicide

14   that occurred at Premium Package Store when the

15   defendant Willie Gardner, also known as Wet

16   Willie, came to headquarters and turned himself

17   in.

18        The defendant was turned over to Detective

19   Keith Barnett, along with Detective Martino

20   from Detective Howton.  He was turned over for

21   an interview.  Detective Martino was present

22   when the defendant was read his juvenile

23   right's form.  He stated that he was with his

24   girlfriend at her house at the time of the

25   incident.  Detective Martino then took the

1    defendant from the audio/video room to a secure

2    holding area.

3        State's Exhibit 34 would be the juvenile

4    right's form the defendant signed at the time

5    they interviewed him.

6        The testimony of Detective G. R. Naquin.

7    Detective Naquin is a robbery/homicide

8    detective also with the Montgomery Police

9    Department.  He assisted in the investigation

10   of the robbery/homicide that occurred at

11   Premium Package Store.  Detective Naquin was

12   asked to transport the defendant from the

13   secure holding area where he was left by

14   Detective Martino to the county jail.

15       Later that day, at about 8:40 a.m.,

16   Detective Naquin was advised by Detective Keith

17   Barnett that the defendant's mother, Felicia

18   Gardner, called and told them that the

19   defendant wanted to talk to detectives at this

20   time.

21       Detective Naquin and Detective Barnett

22   went to the Montgomery County Detention

23   Facility and made contact with the defendant.

24   They told him that his mother had called and

25   said that he wanted to give a statement, and

1    they asked him if this was true.  The defendant

2    said yes, he did want to talk, and they brought

3    him to headquarters and escorted him

4    immediately to the audio-video room to get a

5    statement from him.

6       The defendant was read his juvenile

7    right's form, his adult right's form, and he

8    signed both of those forms indicating that he

9    understood his rights.  An oral statement was

10    first taken from the defendant, and then the

11    defendant gave a statement that was recorded on

12    audio cassette and video.

13       State's Exhibit 36 is that juvenile

14    right's form that his rights were read from and

15    which he signed indicating that he understood

16    them.  State's Exhibit 37 is the adult rights

17    form from which his rights were read and that

18    the defendant signed, indicating that he

19    understood them.

20       State's Exhibit 36 and 37 are in the same

21    or substantially same condition as when they

22    were filled out.

23       Judge, we offer State's 36, 37.

24             (State's Exhibits 36 and 37 were

25               admitted into evidence.)

1          MS. PERKINS:  Not yet.  State's

2     Exhibit 38 is a video statement that was taken

3     of the defendant while he was giving his

4     statement.  State's Exhibit 39 is an audio

5     statement that was taken, along with the video

6     recorder.  State's Exhibit 40 is an audio

7     statement also that was taken as the defendant

8     was giving his statement.  State's Exhibit 41

9     is a transcript of the defendant's statement.

10          Next is the stipulations for Lieutenant

11     Gantt.  Lieutenant M. L. Gantt is a lieutenant

12     with the Montgomery Police Department in the

13     detective division.  He participated in the

14     investigation of this robbery/homicide that

15     occurred at the Premium Package Store.

16          He received a call from the defendant's

17     mother, Felicia Gardner, on September 5th, 2003

18     informing her that the defendant wanted to

19     speak with investigators about the case.

20     Lieutenant Gantt relayed this information to

21     the case agent, Keith Barnett, and sent

22     Detective Barnett and Detective Naquin to the

23     Montgomery County Detention Facility to talk

24     with the defendant.

25          MR. KIDD:  Your Honor, at this time,

1    the State calls Detective Keith Barnett.

2              KEITH BARNETT

3         The witness, having first been duly sworn

4    to speak the truth, the whole truth and nothing but

5    the truth, took the stand and testified as follows:

6              DIRECT EXAMINATION

7    BY MR. KIDD:

8    Q.   Sir, if you would, introduce yourself to the

9         ladies and gentlemen of the jury, please.

10   A.   Yes.  My name is Keith Barnett.

11   Q.   Mr. Barnett, how are you currently employed?

12   A.   I work for the Montgomery Police Department,

13        detective division, robbery/homicide bureau.

14   Q.   Detective Barnett, how long have you been

15        associated with law enforcement?

16   A.   Approximately 10 years.

17   Q.   And how long have you worked as a detective in

18        the robbery/homicide division of the Montgomery

19        Police Department?

20   A.   Seven and a half years.

21   Q.   Detective Barnett, does the term case agent

22        have any specific meaning to you?

23   A.   Yes.  The case agent in a case would basically

24        be the investigator, the lead investigator in

25        the case.  He would be the most knowledgeable

1   in the case.  Needless to say, I don't believe

2   there's any one person who could be able to

3   quote every single word in a case as

4   complicated as a murder case, much less one

5   like we're talking about at this time, but he

6   would be the one that would be most familiar

7   with what everybody has done.  He would be the

8   one to compile all the paperwork and present

9   all the evidence to the District Attorney's

10   office and see the case through.

11  Q.   And Detective Barnett, were you in fact not the

12       case agent assigned to the investigation of the

13       shooting death of Travis Benefield?

14  A.   Yes.

15  Q.   And as the case agent, would it be fair to say

16       that other detectives with the Montgomery

17       Police Department helped you in your

18       investigation of Willie Gardner?

19  A.   Yes.

20  Q.   And pursuant to those investigations, they

21       turned documents over to you and advised you

22       the steps that they had taken and the findings

23       that they had made during that investigation?

24  A.   Yes.

25  Q.   Sergeant Barnett, back on September the 3rd of

1       2001, did you have an occasion to go to Premium

2       Package on Adams Avenue?

3  A.  I did.

4  Q.  Once you arrived there, what was the first

5       thing that you did?

6  A.  Upon arrival there, of course, I met with the

7       investigators that were on the scene already,

8       ensured that I was placed on the crime scene

9       log.  And then I was escorted through the crime

10      scene and basically advised as to the situation

11      at that time.

12  Q.  And what other detectives were there on the

13      crime scene, if you recall?

14  A.  I know Detective Howton was there at that time,

15      and I believe -- I'm trying to remember.

16  Q.  Detective Barnett, there were other detectives

17      there that had that crime scene secured?

18  A.  Oh, yes.  There were several police officers

19      there securing the scene, and then there were

20      detectives already there trying to establish

21      what was -- the substance inside the scene.

22  Q.  Detective Barnett, I'm going to show you what

23      we've marked State's Number 1.  Can you

24      identify State's 1 for me, please?

25  A.  Let me see what it is.  If I'm not mistaken,

1       this is going to be the video from the business

2       itself, but I'm trying to confirm that.  Hold

3       on just a second.

4           MR. BELSER:  Judge, we'll stipulate

5       that that is the videotape from the store.

6  Q.  Detective Barnett, once you were there at the

7       crime scene, did you have the occasion to

8       review or to look at State's Exhibit Number 1

9       while you were there at the crime scene?

10  A.  I did.

11  Q.  Detective, State's Exhibit Number 3, which is

12       now on the screen, that is the location there

13       on Adams Avenue that you responded to?

14  A.  Yes.

15  Q.  Now, Detective Barnett, while you guys were

16       there investigating the crime scene, what other

17       detectives were involved with taking a

18       statement from the surviving victim, Mr. Ray

19       Davis?

20  A.  I know that Detective Cristler responded to the

21       hospital and spoke to Mr. Davis at the

22       hospital.

23  Q.  And was he able to speak to Mr. Davis prior to

24       him having surgery?

25  A.  Yes.

1    Q.   And after speaking to Mr. Davis, was there a
2         suspect that was identified?
3    A.   Yes, there was.
4    Q.   And who was that suspect?
5    A.   Willie Gardner.
6    Q.   Now, Detective Barnett, I believe this actually
7         occurred somewhere around eight o'clock in the
8         evening.  During the course of the night and
9         early in the hours of the next morning, were
10        members of the Montgomery Police Department
11        able to locate Willie Gardner?
12   A.   No.
13   Q.   What efforts were made in order to contact him
14        or to find him?
15   A.   Detectives responded to his residence in the
16        Tulane Court area and actually made contact
17        with his family members advising that we needed
18        to speak to him.
19   Q.   After making contact with his family members
20        and advising them of your need to speak with
21        Mr. Gardner, at some point in time, did you
22        have the occasion to speak with Mr. Gardner?
23   A.   Yes, we did.
24   Q.   How did that occur?
25   A.   Mr. Gardner came to the police department and

1    turned himself in.

2  Q.  Do you know when, approximately, it was?  The

3    date?

4  A.  It would have been the following day, which

5    would have been on the 5th -- I'm sorry.  Hold

6    on.

7  Q.  Detective Barnett, I'm going to show you what's

8    marked State's Exhibit Number 33.  If you'll

9    take a look at this.  Can you identify State's

10    Exhibit 33 for me, please?

11  A.  Yes.  This is a witness locator that I typed up

12    on Willie Gardner.

13  Q.  Does it have a date on there?

14  A.  No, it does not.

15  Q.  Okay.  What exactly is a witness locator?

16  A.  A witness locator is a -- it's a sheet of paper

17    that has all the pertinent information on a

18    witness, his name, date of birth, Social

19    Security number, an address, place of business,

20    and also has an alternate contact in case we

21    need to get in touch with that person and

22    they've moved or we're not able to locate them

23    for some reason, we can call this other person

24    who would be able to refer us to them.

25  Q.  I show you State's Exhibit Number 34 and 35.

1        If you'll take a look at those for me.

2    A.   Okay.

3    Q.   What is State's Exhibit Number 34, first?

4    A.   This is the juvenile right's form I read to

5         Willie Gardner on the 4th, September the 4th

6         2001 at about 4:23 in the morning.

7    Q.   Now, Detective Barnett, if you could, just

8         briefly explain the procedures of how the

9         Montgomery Police Department goes about

10        informing an individual of any constitutional

11        rights that they have.

12   A.   Okay.  This is a standardized form that's used

13        in all type of investigations, okay?  In this

14        case, this form was a juvenile rights form.  At

15        the time, Mr. Gardner was a juvenile.  And

16        basically, we go over the form with them line

17        by line, okay?  Specifically, I'll go over each

18        and every line with the person I'm questioning,

19        and I will insure after I read each and every

20        phrase to them that I asked them do you

21        understand what I've just read to you, or do

22        you understand and get a verbal response from

23        them.  I then check off on the form as to

24        whether or not they did acknowledge.

25   Q.   Did Willie Gardner acknowledge to you in any

```
 1            way that he understood those rights?
 2    A.    Yes, he did.
 3    Q.    And Detective Barnett, did you advise him of
 4          these rights prior to speaking to him regarding
 5          his involvement, if any, in this alleged
 6          shooting?
 7    A.    Yes, I did.
 8    Q.    State's Exhibit Number 34, is it in the same or
 9          substantially the same condition as it was when
10          you read it and got his signature on there?
11    A.    Yes, it is.
12                 MR. KIDD:  Judge, we offer State's 2
13          at this time -- or, excuse me, 34 at this time.
14                 MR. BELSER:  No objection to 34 or 33.
15                 THE COURT:  All right.  They are
16          admitted.  Did you offer 33?
17                 MR. KIDD:  I have not yet, but we
18          offer it at this time.
19                 THE COURT:  It's admitted.
20                      (State's Exhibits 33 and 34 were
21                       admitted into evidence.)
22    Q.    Detective, I'm going to show you now State's
23          Exhibit 35.  Can you explain or can you
24          identify State's Exhibit Number 35 for me,
25          please?
```

1    A.    Yes.  This is a photograph that was taken of

2          Willie Gardner on the morning that he was

3          questioned when he turned himself in.

4    Q.    And Detective Barnett, what's the purpose of

5          taking that photograph?

6    A.    Identification purposes.

7    Q.    And State's 35, is it a fair and accurate

8          representation of the photograph that was taken

9          of Willie Gardner?

10   A.    Yes.

11              MR. KIDD:  Judge, we offer State's 35

12         at this time.

13              MR. BELSER:  No objection.

14              THE COURT:  It's admitted.

15                   (State's Exhibit 35 was admitted

16                   into evidence.)

17   Q.    Detective Barnett, after advising Mr. Gardner

18         of his constitutional rights and having him --

19         let me show you just for a second State's

20         Exhibit Number 36.  Detective, I'm going to

21         zoom in on this a little bit so we can see it a

22         little bit better.  There appears to be --

23         there are some check marks on that, Detective

24         Barnett.  What were those checks marks?

25   A.    That's -- as I read each line and I ask the

1        subject if he understands each right, and he

2        acknowledges he does, I check it.

3   Q.  Detective Barnett, after going over these

4        procedures with Mr. Gardner, what, if anything,

5        did he tell you about his involvement in this

6        robbery/homicide?

7   A.  That he had been at his girlfriend's house.

8   Q.  Detective Barnett, at that point in time, where

9        was Mr. Gardner taken?

10  A.  At that point in time, he was then held until I

11       could finish the paperwork processing him and

12       charging him with capital murder, and then he

13       was taken and placed in the Montgomery County

14       Detention Facility.

15  Q.  Now, the following morning, what, if anything,

16       happened with regard to Mr. Gardner making

17       attempts to get a message to you?

18  A.  I was advised by my supervisor, Lieutenant

19       Gantt, that Mr. Gardner wished to speak with me

20       on this date. And at that point in time,

21       myself and Detective Naquin went to the

22       Montgomery County Detention Facility where we

23       picked Mr. Gardner up.

24  Q.  When you arrived there at the jail, what did

25       you do?

1   A.   They brought Mr. Gardner down to the area where

2        you pick prisoners up and drop them off. I

3        asked him right then, Mr. Gardner, do you want

4        to come give me a statement? Is that what

5        you're telling me now? He advised he did. We

6        then brought him back to the city where we took

7        him back to the interview room and took a

8        statement from him.

9   Q.   This occurred the following morning after the

10       first interview, two days after the shooting?

11  A.   Yes, sir.

12  Q.   Detective Barnett, I'm going to show you what's

13       been marked for identification purposes 36 and

14       37 and ask you if you can identify 36 and 37

15       for me, please?

16  A.   Yes. These are -- 36 is a juvenile rights form

17       that I read to Mr. Gardner on the 5th of

18       September at 8:45 in the morning. And then

19       Exhibit 37 is an adult rights form that I read

20       to him on the 5th of September immediately

21       following the juvenile rights form at 8:45.

22  Q.   And Detective Barnett, did you follow those

23       same procedures as far as advising Mr. Gardner

24       of his constitutional rights as you had done on

25       the previous day?

1   A.   I did.

2   Q.   Now, Detective Barnett, I notice State's

3        Exhibit Number 37 is an adult waiver of rights

4        form.  What's the difference between the two of

5        those?

6   A.   Basically, the difference between the two forms

7        is only one line in the form.  But the

8        difference is juvenile rights forms are read to

9        juveniles and adult rights are read to adults.

10   Q.   On this particular occasion, why did you read

11        Mr. Gardner both his juvenile rights and his

12        rights as an adult?

13   A.   Because Mr. Gardner at this time is a juvenile;

14        however, he is facing adults charges, due to

15        his age.

16   Q.   And once you went over both of those forms with

17        Mr. Gardner, did he acknowledge to you in any

18        way that he understood what his constitutional

19        rights were?

20   A.   Yes.

21   Q.   And how did he do that?

22   A.   He acknowledged them by reading the waiver at

23        the bottom of both of the forms back or going

24        over the waiver with me as I read it to him,

25        and then he signed at the bottom of both forms

1    acknowledging he understood his rights and
2    wished to give me a statement.
3    Q.   And do those two documents have the same check
4    marks on them as the previous document had?
5    A.   Yes.
6    Q.   Okay.  After advising Mr. Gardner of his
7    constitutional rights, did he voluntarily give
8    you a statement?
9    A.   He did.
10   Q.   Detective Barnett, I'm showing you what's been
11   marked as State's Exhibit Number 38.  Can you
12   identify State's 38?
13   A.   Yes.
14   Q.   What is State's 38?
15   A.   This would be the videotaped statement given to
16   me by Mr. Gardner.
17   Q.   Now, prior to coming and testifying in court
18   today, have you had an opportunity to review
19   State's Exhibit Number 38?
20   A.   Yes, I have.
21   Q.   Does State's Exhibit Number 38 fairly and
22   accurately record the video interview that you
23   had with Willie Gardner, I believe it was on
24   September the 5th?
25   A.   Yes, sir.

1              MR. KIDD:  We offer State's Exhibit

2      Number 38 at this time.

3              MR. BELSER:  No objection.

4              MR. KIDD:  Judge, permission to play

5      it for the jury?

6              THE COURT:  How long is it?

7              MR. KIDD:  40 minutes.

8              THE COURT:  We've been over an hour.

9      Y'all approach a second.

10                     (The following occurred at the

11                      bench outside the hearing of the

12                      jury:)

13              THE COURT:  I don't like keeping them

14      after five.

15              MR. BELSER:  I don't have a problem.

16      I thought it would be about 5:30.

17              MS. BROOKS:  This is the last

18      witness.  We'll play this tape and then play

19      the surveillance tape.

20              THE COURT:  How long will that take?

21              MR. KIDD:  Be done within an hour.

22              THE COURT:  Let me give them a break.

23                     (The following occurred in

24                      open court:)

25              THE COURT:  Ladies and gentlemen,

1   excuse me.  Let's take about a -- I'm going to

2   give you a break in the deliberation room for

3   about 5 minutes.  We're going to try to get

4   through today with this officer, and then we'll

5   start up tomorrow morning.  But does that cause

6   anybody any problems to go to about 5:30

7   today?  Is that going to cause anybody any

8   problem?  Anybody we need to contact?

9           PROSPECTIVE JUROR:  I need to contact

10  my office.

11          THE COURT:  Okay.  We'll do that.

12  We'll let you do that.  Anyone else?

13      All right.  Let me ask, if you would, take

14  about a five, 10-minute break in this

15  deliberation room.  We'll be right with you.

16              (Short recess)

17          THE COURT:  All right.  You can have a

18  seat.  Thank you.

19          MR. KIDD:  Your Honor, I believe

20  before we recessed, the State had just offered

21  State's Exhibit Number 38.  We renew the offer

22  on State's Exhibit Number 38 and request

23  permission to play it before the jury.

24          THE COURT:  All right.

25              (Videotape was played in open

1              court.)

2    Q.    Detective Barnett, I'm going to show you now

3          what's been marked as State's Exhibit Number

4          40, State's Exhibit Number 39, State's Exhibit

5          Number 41.  Let's start with 39.  Can you

6          identify that for me, please?

7    A.    Yes.  This would be an audio copy of the

8          statement taken from Willie Gardner.

9    Q.    Now, I see that has the initials ET.  Can you

10         explain that?

11   A.    Yes.  Inside the room where the videotape is

12         filmed, there's a tape machine running in there

13         also to have a back-up tape.  That's this tape

14         from that room.

15   Q.    What about State's Exhibit Number 40?  Can you

16         identify it for me, please?

17   A.    Yes.  This would be an audiotaped statement of

18         the statement taken from Willie Gardner that I

19         took in the room with him on the tape player

20         that was on the table.

21   Q.    Is that the cassette we see you turning over

22         during the course of the interview?

23   A.    Yes, it is.

24   Q.    Now, with regard to State's 39 and State's 40,

25         have you had the occasion prior to today to

1       listen to those two audio tapes?

2   A.  Yes.

3   Q.  Do they fairly and accurately represent the

4       conversations that you had with Willie Gardner

5       on that date?

6   A.  Yes, they do.

7               MR. KIDD:  Judge, we offer 39 and 40

8       at this time.

9               MR. BELSER:  No objection.

10  Q.  With regard to State's Exhibit Number 41, can

11      you identify this document?

12  A.  Yes.  This would be the transcribed statement

13      of the video statement that was just played.

14  Q.  And Detective Barnett, I notice that there is a

15      signature at the bottom of this particular

16      statement on the first page; is that correct?

17  A.  Yes.

18  Q.  Whose signature is that?

19  A.  That's mine.

20  Q.  And the purpose of you signing that signature,

21      is it to authenticate that particular

22      transcript as being a true and correct

23      transcription from the audio tape?

24  A.  Yes.

25  Q.  And is that a true and correct transcription?

1    A.   Yes.

2               MR. KIDD:  Judge, we offer State's

3    Exhibit Number 41 at this time.

4               MR. BELSER:  No objection.

5               THE COURT:  40 and 41 are admitted.

6                  (State's Exhibits 40 and 41 were

7                  admitted into evidence.)

8    Q.   Detective Barnett, I asked you earlier, State's

9       Exhibit Number 1, if you've had an occasion to

10      view that videotape at Premium Package?

11   A.   Yes.

12   Q.   This State's Exhibit Number 1, is it the same

13      videotape that you're showing Willie Gardner

14      during the video?

15   A.   The tape I showed him was actually a slowed

16      down copy of that.  That's the actual original

17      tape from the store.

18   Q.   State's Exhibit Number 1 is the original.  What

19      we saw you talking to Willie Gardner on the

20      video was a copy of State's Exhibit Number 1?

21   A.   Yes.  I had to slow it down on a machine that

22      -- make a dub of it and slow it down because

23      it's high speed, a real high speed tape.

24              MR. KIDD:  Judge, we offer State's

25    Exhibit Number 1 at this time.

1      MR. BELSER:  Judge, I believe it's

2 already admitted, but no objection.

3      MR. KIDD:  Judge, permission to play

4 this for the jury.  Ask permission from the

5 Court to play State's Exhibit Number 1 for the

6 jury.

7      THE COURT:  How long is this one?

8      MR. KIDD:  About five or 10 minutes.

9      THE COURT:  All right.

10      MR. KIDD:  Judge, can I ask Detective

11 Barnett to step down for me?

12      THE COURT:  All right.

13 Q. Detective Barnett, I want to give you this

14 pointer here.  I tell you what, Detective, if

15 you'll stand right there from the corner.  All

16 right.  Detective, I'm going to let this play

17 through, but before I let it play through, can

18 you identify these particular screens for me?

19 A. Yes.  The top left screen is going to be a

20 camera behind the bar area pointing to the

21 back, towards the back of the store.  The front

22 of the store would be towards the bottom.  When

23 you come in, it would be to the left of the

24 store.  The top right is an exact opposite

25 angle.  Back up in this top left corner of this

1  screen would be where the front door area is.

2  If you remember from watching the video

3  earlier, when you came in, there was an

4  entranceway to the left that goes behind the

5  bar.  That would be this entranceway right

6  here.  It points the opposite direction.  The

7  bottom left is actually the room in the back

8  where the safe and the videotape and where Ray

9  was located by police when they arrived.  And

10  the bottom right here would be an outside video

11  of the -- this is the hallway that comes to the

12  back of the store, and the door that goes back

13  up into this office here was right here.

14  Q.  And Detective Barnett, I notice that the date

15  on this is 4/10 of '96, and a time 0505 hours.

16  That date and time is incorrect?

17  A.  That's correct.

18  Q.  And I believe, according to the 5:05, this is

19  about two minutes before the gunmen entered the

20  store; is that correct?

21  A.  I believe so, yes.

22  Q.  Okay.  We're going to play this now.

23  (Videotape was played in open

24  court.)

25  Q.  Detective Barnett, this is playing at fast

1          speed.  That's because it's time lapse; is that

2          correct?

3     A.   Correct.

4     Q.   Detective Barnett, use your pointer and show me

5          where the front of the store is going to be.

6     A.   The front of the store is going to be up here

7          where people -- you see people coming in and

8          out through this door right here.  That is

9          actually the entranceway right behind these

10         numbers right there.

11    Q.   Can you point to Delano Smith?

12    A.   That would be Delano there.

13    Q.   Where is Travis Benefield?

14    A.   Travis is lying on the floor right here.

15    Q.   And who is in the white shirt?

16    A.   That would be Anthony Fuller.  This is Ray

17         Davis, and that is Willie Gardner.

18    Q.   I'm going to back this up just a little bit.

19         All right.  Can you show me the front door in

20         this picture?

21    A.   There is the front door there.

22    Q.   Okay.  And where is Ray and where is Travis

23         Benefield going to be?

24    A.   Travis is now lying on the floor.  Okay.  He

25         just fell down to the floor.  All right.  Ray

1      would be standing down at the end of this bar.

2      There's an area you can cut in behind the bar,

3      the far end down here as well. The subjects

4      have entered the store. At this time, the

5      shots have already -- they started being fired

6      as they came in the front door.

7   Q.  Now, there at the top right, can you tell who

8      that is coming through the door?

9   A.  At this point in time, it's hard to determine

10     exactly who that is. He's got a dark shirt and

11     dark pants on, which would rule Anthony Fuller

12     out. That person at that point in time would

13     either be Willie Gardner or Delano Smith.

14  Q.  Okay. So you can see one person has come

15     through. What about the door now?

16  A.  Here comes another, coming behind the counter.

17     And this would be -- and there comes a third

18     person through the door now with a white shirt

19     and dark pants on. That would be Anthony

20     Fuller there. And this person standing down at

21     the other end of the bar --

22  Q.  What is that in the bottom part of the screen

23     there?

24  A.  Down here?

25  Q.  Yes.

1   A.   That appears to probably be Travis Benefield.

2   Q.   Okay.  And the person there in the white shirt,

3        could you identify who that was?

4   A.   That's going to be Anthony Fuller.

5   Q.   Now, in the top left screen, are both Travis

6        Benefield and Ray Davis still on the floor

7        there?

8   A.   No.  Just -- well, yes, I'm sorry.  Ray is back

9        here and there is Travis there.

10  Q.   Who is this in the black shirt there?

11  A.   In the black, this would be -- if you look at

12       the gun, chrome top, doesn't match the

13       description given to me by Willie Gardner,

14       clothing doesn't match.  That would be the

15       Delano Smith.

16  Q.   Is Willie Gardner in any one of these frames at

17       this point?

18  A.   No, at this point in time, you can't see him

19       because they don't have a video that covers the

20       outside where the merchandise is located out

21       there.

22  Q.   Now, Detective Barnett, I'm going to draw your

23       attention to the top right screen in the bottom

24       portion.  It appears that two hands are coming

25       up.  Can you tell me who they belong to?

1    A.    Correct.  This would be Travis Benefield

2          raising his hands.  And you can see a better

3          shot of him down on the left laying there.  If

4          you'll notice, Ray has already gotten up from

5          here.

6    Q.    All right.  In the bottom right-hand screen?

7    A.    Here comes Ray Davis.

8    Q.    And who is that holding a gun on Ray?

9    A.    This would be Willie Gardner holding the gun on

10         him.

11   Q.    Okay.  Right here, Detective, can you tell what

12         just happened?

13   A.    Hold on.  You'll see right here there is a shot

14         that gets fired into the floor.  It's not right

15         there.  It comes right here.  Right there.

16         Now.  See, Ray jumps as he fires a shot into

17         the floor.

18   Q.    What's going on in the top left-hand screen?

19   A.    In the top left-hand, Anthony Fuller is still

20         emptying the registers.  Travis Benefield is

21         still alive, and Delano Smith is standing over

22         Travis with a gun.  Now, right here, stop it

23         right quick.  At this point, Ray makes a break

24         to get inside the office to lock himself in.

25   Q.    Now, at that point, was Ray shot in the back,

1          Keith?  Do you know?  Detective Barnett, do you
2          know?
3   A.     I can't recall exactly.  I know he was shot in
4          the abdomen twice and had one wound to the arm.
5   Q.     And the gun there appears to be an all black
6          gun, correct?
7   A.     Yes.  And it appeared to have been fired at
8          least once before the door shut.  Now, he opens
9          the door, and you can't really see anything but
10         the bottom part of Ray's legs here where he's
11         trying to keep the door shut.
12  Q.     Now, when all of this is going on, what's going
13         on in the top left-hand screen?
14  A.     At this point in time, Travis is still alive.
15         His head is still up, hands are still moving.
16         They are still taking stuff from out of the
17         registers and so forth.
18  Q.     And Delano Smith, can you tell what direction
19         he's looking?
20  A.     Delano Smith looks to the back at this point in
21         time.  This is Delano here.
22  Q.     And shots are being fired?
23  A.     Yes, shots have already been fired in the back.
24  Q.     Detective Barnett, can you see something
25         coming?  Does that appear to be a muzzle flash

1        there?

2    A.  Here?

3    Q.  Yes.

4    A.  Yes, right there.  The gun actually recoils

5        there.

6    Q.  Now, in the top left-hand frame, what's going

7        on here?

8    A.  At this point, Delano Smith has the gun

9        pointing still at Travis.  Travis has already

10        been shot here as well, but in the body, okay?

11        Before he was on the ground, he was shot.  At

12        this point in time, Delano shoots Travis in the

13        back of the head at that point right there.

14        Travis's head goes down, hands go underneath

15        his face.  He has been shot in the back of the

16        head and killed right there.

17            Ray is back here calling for help.

18        Anthony Fuller is still taking stuff from under

19        the counter.  Delano Smith has left.  Here

20        comes Delano Smith now in the bottom right.  He

21        attempts to get in this door, sees it's

22        locked.  Here comes Willie Gardner.  Delano

23        Smith goes back, wipes the handle.  Willie

24        Gardner comes up here and stands over Travis's

25        dead body and steals a gun.  And at this point

```
 1          in time, all three subjects then exit the store
 2          together.
 3     Q.   Thank you, Detective.
 4               And finally, Detective Barnett, the names
 5          of the participants and their aliases, were you
 6          able to determine whether or not these were
 7          true and correct aliases for the four
 8          defendants?
 9     A.   Yes, they are.
10     Q.   And Willie Gardner was Wet Willie, the
11          defendant?
12     A.   Yes.
13     Q.   And Delano Smith is Pop?
14     A.   Yes.
15     Q.   And Anthony Fuller was Ant?
16     A.   That's correct.
17     Q.   And Taurus Hall was Big Bug?
18     A.   Yes.
19     Q.   And the only other individual that we have
20          heard about in that tape was Solo, which was
21          Tawaskie Williams, correct?
22     A.   Correct.
23               MR. KIDD:   Judge, I have no further
24          questions.
25               THE COURT:   All right.
```

1      MR. BELSER:  No questions.

2      MS. BROOKS:  I may ask the court

3  reporter to confirm whether or not State's

4  Exhibit 20 has been admitted yet?

5      THE COURT:  Yes, ma'am.

6      MS. BROOKS:  I've got State's Exhibit

7  31.

8      COURT REPORTER:  Yes.

9      MS. BROOKS:  It is?

10      COURT REPORTER:  Yes.

11      MS. BROOKS:  State's Exhibits 36 and

12  37.

13      COURT REPORTER:  I don't have them.

14      MR. BELSER:  I have no objection to 36

15  and 37.

16      MS. BROOKS:  At this time, the State

17  would offer Exhibit 20, the 911 audiotape

18  identified by Ray Davis.

19      MR. BELSER:  No objection.

20      THE COURT:  All right.  20 is

21  admitted.

22          (State's Exhibit 20 was admitted

23           into evidence.)

24      MS. BROOKS:  State's Exhibit 36 and

25  37, the rights forms of the defendant on

1     September the 5th.

2              MR. BELSER:  No objection.

3              THE COURT:  36 and 37 are admitted.

4                   (State's Exhibits 36 and 37 were

5                   admitted into evidence.)

6              MS. BROOKS:  And State's Exhibit

7     Number 45, the list of nicknames that Mr. Kidd

8     just had the witness confirm.

9              MR. BELSER:  No objection.

10             THE COURT:  It's admitted.

11                  (State's Exhibit 45 was admitted

12                  into evidence.)

13             MS. BROOKS:  We have no further

14    witnesses.  At this time, we would offer from

15    the court records State's Exhibit 42, the plea

16    agreement entered into between the State and

17    the defendant.

18             MR. BELSER:  No objection.

19             THE COURT:  I'm sorry.  What was that

20    number again?

21             MS. BROOKS:  State's Exhibit Number

22    the 43, the Exhibit A, which is the explanation

23    of rights of the defendant.

24             THE COURT:  What was the first

25    number?  I'm sorry.  I didn't hear you.

```
 1              MS. BROOKS:  42.  It's on the list,
 2     Judge.
 3              THE COURT:  42 is admitted.
 4                   (State's Exhibit 42 was admitted
 5                   into evidence.)
 6              MS. BROOKS:  43, the explanation of
 7     rights and the plea of guilty of the defendant.
 8              MR. BELSER:  No objection.
 9              THE COURT:  43 is admitted.
10                   (State's Exhibit 43 was admitted
11                   into evidence.)
12              MS. BROOKS:  And lastly, State's
13     Exhibit 44, the transcript of the plea.
14              MR. BELSER:  No objection.
15              THE COURT:  It's admitted.
16                   (State's Exhibit 44 was admitted
17                   into evidence.)
18              MS. BROOKS:  Your Honor, rather than
19     read the entire exhibit, if we could go to page
20     6 of that exhibit.  And I will read the
21     question as the lawyer, and Mr. Kidd, if you
22     would read the response of the defendant from
23     the exhibit.
24                   (Excerpt was read as follows:)
25     Q.   (By Ms. Brooks) Willie, did you and Anthony
```

```
 1        Fuller and Delano Smith enter the Premium
 2        Package Store on Adams Avenue here in
 3        Montgomery County back on September 3rd, 2001
 4        to commit a robbery?
 5   A.   (By Mr. Kidd) Yes, sir.
 6   Q.   And was Taurus Hall also involved in this
 7        robbery?
 8   A.   Yes, sir.
 9   Q.   Was he the look-out?
10   A.   Yes, sir.
11   Q.   Did he go into the store and make sure the
12        coast was clear and y'all could then enter the
13        store?
14   A.   Yes, sir.
15   Q.   And did he come back outside and wave to you to
16        let you know the coast was clear?
17   A.   Yes, sir.
18   Q.   And then did you and Anthony Fuller and Delano
19        Smith enter the store to commit the robbery,
20        and during the course of that robbery, did you
21        shoot Raymond Davis?
22   A.   Yes, sir.
23   Q.   And during the course of that robbery, did
24        someone -- from what we understand, Delano
25        Smith -- shoot and kill Travis Benefield?
```

1    A.    Yes, sir.

2    Q.    And after this offense, did the three of y'all

3          leave the scene, meet up and divide the

4          proceeds from the robbery?

5    A.    Yes, sir.

6    Q.    Also, not only was money taken from the Premium

7          Package Store but a weapon was taken from the

8          Premium Package Store?

9    A.    Yes, sir.

10   Q.    And did you do that?  You took a weapon?

11   A.    Yes, sir.

12   Q.    Did anyone else take a weapon from the store?

13   A.    Ant.

14   Q.    Anthony Fuller?

15   A.    Yes, sir.

16              MS. BROOKS:  Thank you.

17         At this time, the State of Alabama rests

18    its case in chief.

19              THE COURT:  All right.

20              MR. BELSER:  The defense will not

21    present any witnesses and rests.

22              THE COURT:  All right.  Ladies and

23    gentlemen, I'm going to let you go for the

24    night.  Let me ask that you be back here --

25    what time do y'all want to start?  Is nine

```
 1        okay?
 2                 MS. BROOKS:  Whatever the Courts want.
 3                 THE COURT:  Nine o'clock.  All right.
 4        Nine o'clock.  Again, I must caution you on
 5        listening to any news media concerning this
 6        case.  I've given you that instruction several
 7        times.  Do not discuss this case among
 8        yourselves or with anyone else and also do not
 9        discuss it with your spouse or ask them what
10        they think, he or she may think, okay?  And
11        we'll see you tomorrow morning.  Let me also
12        caution you on what will happen in the jury
13        assembly room.  Some people have newspapers and
14        everything, and they may try to discuss
15        something that they may see in the newspaper.
16        So let me caution you not to pick it up or be
17        where you can hear something like that.
18            All right.  Anything else?
19                 MR. BELSER:  No.
20                 THE COURT:  All right.  Thank y'all.
21        We'll see you tomorrow morning.  Let me ask
22        that you step in that room one second.
23                     (The following proceedings
24                      occurred outside the presence of
25                      the jury:)
```

1              THE COURT:  Ms. Brooks, let me ask

2       y'all something.  Do you want to go ahead and

3       try to do this tonight or do y'all want to -- I

4       mean, how long is closing?  I don't want to

5       keep them too much longer.

6              MS. BROOKS:  Fifteen minutes for us.

7              MR. BELSER:  Zero for the defense.  We

8       could waive closing arguments.  I mean, there's

9       not much else you can do.

10             MS. BROOKS:  The last jury took 15

11      minutes to deliberate.

12             THE COURT:  Well, I'm ready to go.

13      Y'all think I need to ask these folks what they

14      need to do, if anybody, and see what they say?

15             MS. BROOKS:  If they are willing to

16      go, we are.

17             THE COURT:  And if any of them has any

18      problems, we'll just do it in the morning.

19             MR. BELSER:  That's fine.

20             THE COURT:  Is that okay?

21             MS. BROOKS:  Yes, sir, except could we

22      just go ahead and put on the record that we've

23      had an informal jury charge conference and that

24      both sides are satisfied with the Court's

25      charge?

1      MR. BELSER:  Yes.  I deleted one

2   portion, and I marked it with my initials.

3      THE COURT:  All right.  Let me just

4   look at this before you let them back in.  One

5   second.  I had some questions, so let's just go

6   over them.  Y'all approach.  I can show it to

7   you better than I can talk out loud on the one

8   that -- the pattern instruction.  Or another

9   person, does that need to be there?

10      MS. BROOKS:  Yes, sir.

11      THE COURT:  And then down here.

12      MS. BROOKS:  Deleted.

13      THE COURT:  I deleted dangerous

14   instrument.  I just want to make sure.  Let me

15   just make sure I've got what y'all put here.  I

16   don't want to stop in the middle of it.  I put

17   that in, a gun and/or lawful currency and/or

18   coinage of the United States.  And then Travis

19   Benefield there.  Taken up or escaping with the

20   property has been marked through.

21      Okay.  I need the name of the alternate --

22   the name of the alternates.

23      MS. BROOKS:  Need the alternates?

24      THE COURT:  Yes.

25      MS. BROOKS:  Yes, sir, I've got it.

1       Judge, while I'm getting that, I saw where you

2       marked through expert, but I believe you wrote

3       by it give.  But you're going to give the

4       standard pattern?

5            THE COURT:  It's almost identical to

6       what you had.

7            MS. BROOKS:  Yes, sir.  I show as the

8       alternate 39 and 61, Ms. Boone and Ms. Carson.

9            THE COURT:  Ms. Boone and Ms. Carson.

10           MR. BELSER:  Yes.  I got them all in

11      here.

12           MS. BROOKS:  We agree.  Have you

13      looked at the verdict form already?

14           MR. BELSER:  No, I didn't see it.

15          THE COURT:  I'm going -- it's going to

16      be at least an hour.  Fifteen minutes of

17      closing, another 15 for me.

18          MS. BROOKS:  Whatever you want to do,

19      Judge.

20          THE COURT:  Yes, let's let them go.

21      I'm sorry.  I just --

22          MR. BELSER:  We've taken care of some

23      things.

24          THE COURT:  I don't mind doing it, but

25      I just don't want to --

```
 1              MR. BELSER:  Do you want to ask the
 2      jury?  They all may say let's get it over with.
 3              THE COURT:  I don't mind, but I sure
 4      hate to do --
 5              MS. BROOKS:  And I promise you, my
 6      close is not long.
 7              THE COURT:  Bring them back in.
 8                  (The following occurred in the
 9                  presence of the jury:)
10              THE COURT:  Y'all approach one more
11      second.
12                  (The following occurred at the
13                  bench outside the hearing of the
14                  jury:)
15              THE COURT:  On the front, this has to
16      go.
17              MS. BROOKS:  You have to -- correct.
18                  (Open court.)
19              THE COURT:  Y'all come on in.  Is that
20      everybody?  Y'all be seated.  Let me ask you,
21      I've been discussing with the attorneys while
22      you sat in there.  It's going to take about 15
23      to 20 minutes in closing arguments, another 15
24      to 20 minutes in charging you on the law.  And
25      then I was going to let you deliberate.  Do any
```

```
 1        of y'all want to do that tonight?  Do you want
 2        to do that tonight or do you want to do it in
 3        the morning?
 4                  JUROR:  In the morning.
 5                  THE COURT:  It will be about another
 6        hour is my estimate, at least -- no, about 45
 7        minutes with the closing charge and the --
 8                  JUROR:  Tomorrow.
 9                  JUROR:  Tomorrow.
10                  THE COURT:  Tomorrow?  Is that what I
11        heard?
12                  JUROR:  Yes.
13                  THE COURT:  I'm half deaf.  I
14        apologize to y'all, but I can't hear.  Y'all
15        want to do it tomorrow or tonight?
16                  JUROR:  Tomorrow.
17                  THE COURT:  Okay.  Remember my
18        instructions.  We don't need to have to start
19        this trial over again, okay, so, please,
20        please, do not let -- if you should hear or
21        anybody say anything, you overhear anything,
22        you let me know about it.  But otherwise, I'll
23        see you tomorrow morning, nine o'clock, jury
24        assembly room.  Thank you.  If you would,
25        follow the deputy out she's going to escort
```

1    y'all out, okay?

2                    (Court adjourned.)

3                    OCTOBER 28, 2003

4                    (Defendant present.)

5            THE COURT:  Y'all be seated.  Are you

6    ready to proceed?

7            MS. BROOKS:  Yes, Your Honor.

8            THE COURT:  All right.

9            MS. BROOKS:  Good morning.  This part

10   of the trial they call the closing argument.

11   That's when the opportunity exists to summarize

12   the evidence.  I want, first of all, to tell

13   you that I'm not going to go through every one

14   of the 16 witnesses, okay, nor am I going

15   through the 45 exhibits.  But I would like to

16   highlight a few things.

17       One of the things you don't have the

18   advantage of yet is that you really didn't know

19   exactly what the charge was.  The Judge is

20   about to give you that in great detail.  So

21   anticipating that, what I want to do is briefly

22   discuss the elements or the requirements that

23   we had to prove and how we proved them, okay?

24       So, first, let's start with the actual

25   overall charge.  And these are just some

1    handwritten notes that I made, so if you can
2    read them, I hope.  Okay.  First of all, we
3    have to prove that the defendant, Willie
4    Gardner, did intentionally cause the death of
5    Travis Benefield by shooting him with a gun and
6    caused the death during a robbery first
7    degree.  And underneath that, I've outlined
8    basically what that is, that the defendant
9    and/or an accomplice was in the course of
10   committing a theft of a gun and/or cash -- cash
11   is lawful currency and coinage, okay -- of some
12   value -- we don't have to prove a specific
13   value -- the property of Travis Benefield
14   and/or Premium Package Store.  And how did he
15   do it?  By the use of force against Travis
16   Benefield with the intent to overcome his
17   resistance or power of resistance while the
18   defendant and/or the accomplice was armed with
19   a deadly weapon, in this case, a gun.  So
20   that's it in a nutshell.
21       Let's break it down.  How did we prove
22   each one of these things?  Well, the first
23   thing we have to prove is that it was the
24   defendant, that this defendant, Willie Gardner,
25   was involved.  Okay.  How did we do that?

1     Well, there are numerous ways we've done it in

2     this case.  First of all, Ray Davis said that's

3     who took me to the back.  I recognized his

4     face.  He knew him.

5          Second of all, Tawaskie Williams'

6     stipulated testimony was that he saw them

7     before and after, and he knew what was going

8     on.

9          Third, the statement that this defendant

10    gave to the two police officers that you

11    watched on videotape yesterday when he said,

12    yes, I went in, yes, I was involved; and the

13    guilty plea transcript where Mr. Kidd and I

14    read back and forth his answers to his lawyer's

15    questions.  I was involved.  I am there.  So we

16    know he's there.

17         Then, the next element is did he

18    intentionally cause the death of Travis

19    Benefield?  Well, first of all, was Travis

20    Benefield dead?  Yes, we do know, don't we?

21    How do we know that?  Well, first of all we

22    have the expert opinion of Dr. Bristol, through

23    his autopsy report.  Both his report is in and

24    his stipulated testimony that this man was

25    dead, and it was a result of multiple gunshot

1    wounds.

2        And then we had Ray Davis.  Remember, I

3    had to ask him very near the end, is this

4    Travis Benefield, a picture of him -- and it's

5    in evidence -- and he said yes.  So we know

6    it's Travis that's dead.

7        Second, was it intentional?  Yes.  This is

8    important for y'all to focus in on, okay?  They

9    planned it ahead.  They talked about it

10   specifically.  We're going to have to kill

11   him.  Number two, they went in with guns,

12   loaded guns.  When you use a gun, your intent

13   is inferred to kill.  That's what you do with

14   guns.  Look how many shots were fired at Travis

15   Benefield.  It wasn't a one time deal, was it?

16   Multiple shots to his abdomen and multiple

17   shots to the head.

18       And then look that there were two sets of

19   shots.  The first set didn't kill him, so he

20   shot him again after more of the robbery had

21   occurred and after Willie Gardner had shot Ray

22   Davis.

23       And then where was he shot?  It wasn't in

24   the foot to disarm him or his hand.  It was in

25   the back of the head at near point blank

1    range.

2        Then what did he do from the very

3    beginning?  Willie Gardner never sought help

4    for Travis Benefield.  None of them did.  They

5    ran out.  That tells you their intent was to

6    kill.  And, of course, they left.  They didn't

7    do anything to help him.

8        And lastly, what was the reason they went

9    in there to begin with?  We call that motive.

10   Well, obviously, one was to steal, wasn't it?

11   But you don't have to kill somebody to rob

12   them; but in this case, they did.  And because

13   it was a second motive, it was a revenge

14   factor, but, more importantly, there was the

15   eliminate the witnesses.  The plan was execute

16   the two men who knew them and get the

17   surveillance tape, okay?  So that's why we know

18   it's intentional.

19       The next piece of the element is

20   shooting.  How did they do it?  By shooting

21   Travis with a gun, okay?  Now, we have two

22   expert opinions here.  One was the autopsy

23   where the doctor said he died as a result of

24   multiple gunshot wounds.  The only way you do

25   that is to be shot with a gun.  And number two,

the firearms expert who not only looked at the casings but took the very gun that was found on the other side of the wall that's been identified to have been the one that Pop had and took the casings and compared them with this gun and found, in his expert opinion, seven of the 10 casings were fired through this gun. And those seven casings were all found near the front door and in the area of Travis Benefield. So we know this is the gun that killed him.

There were three other casings, remember? And the expert said they were similar to, but he couldn't say positively they came from this gun. They could have come from a similar weapon. And we know from the evidence that the defendant had a similar weapon. It was also a nine millimeter. So it is possible it came from that gun, but we don't know that from the forensics man because that gun wasn't recovered. Remember, the defendant said he gave it to Big Bug, okay?

All right. We also have a surveillance tape. And that told us that Travis Benefield was shot with a gun because we saw it. And in

1    his statement, the defendant admits that's what

2    happened.  And of course, in his guilty plea he

3    says that.  So we've proven now that's how it

4    happened by being shot with a gun.

5        Now, the last part is the robbery.  How

6    did we know this all happened during a

7    robbery?  Well, first of all, we know there's a

8    robbery.  You might remember from one of the

9    photographs and the video the officer pointed

10   out that he had a -- Travis had a holster that

11   was empty.  We also know that the guns were

12   missing.  Mickey Phillips, the owner, said they

13   were missing.  I think even -- yes, even Ray

14   said they were missing.  The defendant said he

15   took a gun and that Ant took one.  And in his

16   guilty plea, he said the same.

17       We also know money is missing.  Remember

18   the photographs -- and I think we showed you

19   several -- the cash register with those springs

20   that were up?  The drawer is open.  There were

21   no dollars, no bills in there, some coins

22   left.  We know that was missing.  Ray said the

23   money was missing.  Mickey Phillips said it was

24   missing.

25       We also know they -- what were they trying